610 So.2d 1212 (1992)
Arthur DEUTCSH
v.
STATE.
CR 90-1587.
Court of Criminal Appeals of Alabama.
July 24, 1992.
Rehearing Denied September 18, 1992.
Certiorari Denied December 4, 1992.
*1213 J. Mark White of White, Dunn & Booker, Albert C. Bowen, Jr. of Beddow, Erben & Bowen, Robert L. Wiggins, Jr. and Elizabeth A. Evans of Gordon, Silberman, Wiggins & Childs, Birmingham, for appellant.
James H. Evans, Atty., and Joseph G.L. Marston III, Asst. Atty. Gen., for appellee.
Alabama Supreme Court 1912015.
BOWEN, Judge.
Arthur Deutcsh, the former Chief of Police of the City of Birmingham, appeals his conviction for the misdemeanor offense of tampering with governmental records. He received the maximum sentence of 12 months' hard labor in the county jail and was fined $2,000. His conviction must be reversed because the trial court failed to clarify the jury's expressed confusion over the major issue submitted for its decision Deutcsh's legal and criminal liability for the acts of others.

I.
Initially, this Court must determine the exact charge of which Deutcsh stands convicted. The necessity for this determination indicates the confusion which apparently plagued the trial of this case.
Deutcsh was charged with the criminal offense of tampering with governmental records, a Class A misdemeanor. That offense *1214 is defined by Ala.Code 1975, § 13A-10-12, which provides:
"(a) A person commits the crime of tampering with governmental records if:
"(1) He knowingly makes a false entry in or falsely alters any governmental record; or
"(2) Knowing he lacks the authority to do so, he intentionally destroys, mutilates, conceals, removes or otherwise substantially impairs the verity or availability of any governmental record...."[1]
The two-count indictment charged:
"ARTHUR DEUTCSH ... knowingly made a false entry in or falsely altered a governmental record, to-wit: records of the Birmingham City Jail and Police Department in violation of Section 13A-10-12(1) of the Alabama Criminal Code.
"2nd: ... ARTHUR DEUTCSH, ... knowing he lacked the authority to do so, did intentionally destroy, mutilate, conceal, remove or otherwise substantially impair the verity or availability of a governmental record, to-wit: records of the Birmingham City Jail and Police Department, in violation of Section 13A-10-12(2) of the Alabama Criminal Code." R. 1802.
Prior to trial, in response to Deutcsh's motion for a more definite statement pursuant to Rule 15.2(e), A.R.Crim.P.Temp. (now Rule 13.2(e), A.R.Crim.P.), the prosecution identified the governmental records involved in this case:[2]
"[T]he State specifies that the records of the Birmingham City Jail and Police Department alluded to in the indictment are [1] the page from the jail docket book listing the arrest of Erica Arrington, [2] the computer data base record listing the arrest of Erica Arrington, [3] the fingerprint card and [4] the fingerprint log concerning the arrest of Erica Arrington and [5] the photograph of Erica Arrington made during the course of the `booking' process." R. 1832.
At the charge conference on the instructions to be given the jury, the trial judge stated that he was going to submit both counts of the indictment to the jury in the alternative. During his charge, the trial judge instructed the jury that "there could be only one verdict in this case," R. 1418, and submitted only three verdict forms to the juryguilty of Count One, guilty of Count Two, and not guilty. However, the oral charge does not make it clear that the jury could only find Deutcsh guilty of either Count One or Count Two, and that they could not find him guilty of both Counts One and Two.
The jury returned verdicts finding Deutcsh guilty as charged in both counts of the indictment. Immediately after the jury had been discharged, the trial judge announced that he was "only going to consider it as one case," and informed Deutcsh, "The jury, even going beyond the instructions of this Court, found you guilty in Count 2." R. 1437. When defense counsel requested a mistrial based on the verdicts, the trial judge responded, "Overruled. The Court will consider it surplusage. The Court will only mete out one judgment in this case." R. 1438. The trial judge then "adjudicate[d]" Deutcsh "guilty of tampering with government records" without reference to either count. R. 1438.
*1215 At sentencing, the trial judge announced that he had treated the "second verdict" involving Count Two "as being surplusage," and imposed only one sentence. R. 1448. The jury's verdicts on both counts are listed on the case action summary.
No objection was made to the action of the trial judge in treating the "second" verdict as "surplusage" until the motion for new trial. In arguing that motion, defense counsel stated: "[I]t comes under [ground] eleven [of the motion for new trial, R. 1992], where the Court elected to treat one of the verdicts as surplusage. It's our position that, absent the consent of the defendant, that you cannot treat that as surplusage." R. 1508.
We agree with defense counsel's argument. Assuming for purposes of this issue that there was some evidence to support both verdicts, the trial judge had no authority to set aside either verdict at his discretion. Yet, after the jury had returned two verdicts contrary to the trial judge's instructions (however indefinite those instructions were), there was never a request for the trial judge to instruct the jury to conform its verdict to those oral instructions. Therefore, the error has not been preserved for review.[3]
"Defendant's right not to be convicted of both [offenses] can be safeguarded by requesting that the jury be instructed to specify the count under which they find the defendant guilty, and in situations where no evidence is presented as to a particular count, a directed verdict can be requested as to that count."
Ex parte Wilcox, 401 So.2d 794, 796 (Ala. 1981). "The grounds urged for a new trial must ordinarily have been preserved at the trial by timely and sufficient objection." Fuller v. State, 365 So.2d 1010, 1012 (Ala. Cr.App.1978), cert. denied, 365 So.2d 1013 (Ala.1979).
Based on these considerations and the action of the trial court, we find that Deutcsh has been adjudicated guilty and convicted of tampering with governmental records only as charged in Count One of the indictment which states a violation of Ala.Code 1975, § 13A-10-12(a)(1).

II.
The singular predominate characteristic of the instructions of the trial judge and the deliberations of the jury is confusion. Deutcsh's conviction must be reversed because the trial judge failed to respond to the confusion expressed by the jury over the question of Deutcsh's legal and criminal liability for the actions of others.
The jury began its deliberations at 11:16 a.m. At 12:00 noon the jury reported that "there is some confusion between Count One and Count Two." R. 1421. In response, the trial judge reread the statute defining the offense. The jury continued its deliberations at 12:05 p.m. At 1:30 p.m., the jury returned to the courtroom and again indicated its confusion.
"FOREMAN PEACE: Yes, sir, we do [have another question].
"Our question is in the, Count One. The verbiagewe'd like it read again. I think that's an important part to some of us in the jury room is the way it was read, the way it was verbalized to us. I think it's in the verbiage, is what we're looking for.
"There are some things in there that are throwing some of us, particularly.
"Did I make myself
"THE COURT: You lawyers approach the bench.
"(Bench conference, out of hearing of court reporter.)
"THE COURT: Under 13A-10-12, `A person commits the crime of tampering with governmental records if: (1) he knowingly makes a false entry in or falsely alters any governmental record; *1216 or' in the alternative now: `(2) knowing he lacks the authority to do so, he intentionally destroys, mutilates, conceals, removes or otherwise substantially impairs the verity or availability of any governmental record.'[4]
"Those are the two counts within the indictment that this defendant is charged with.
"Here, again, I must remind you, now, you cannot just isolate, because I'm going over those two with you at this point, the two counts. You have to take the Court's entire oral charge so that you can put everything into perspective. And I must rely on your individual recollections as to the definitions I gave you.
"Does that answer y'all's question? Any one of you jurors may speak up if you have a question.
"FOREMAN PEACE: That still doesn't answer
"THE COURT: Let me say this to you: Please, as jurors, rely on just what you've been given, whether it be from the evidence or from the Court's charge as to the law. Don't read anything into it that's not there. I have to caution you as to that.
"Don't presume anything from the evidence that was or was not there. Rely on the evidence as was presented to you, and then take the Court's charge in its entirety with all the definitions.
"Yes, sir, Mr. Peace?
"FOREMAN PEACE: I don't know what I can ask, or what, because there's been so much statement as to who can say what and how you say it, and everything.
"One of the questions that has arisen is didthere's a point heredid the defendant actually order these things to be done, orI'm having a real problem with the verbiage here as to how to getor did the actions of people under his command, if that was the casethat's, somebody said, somebody in the jury said that they heard that through other people's actions the Chief could be held accountable and found guilty of these charges.
"That's where we're having a problem. Is that the case?
"THE COURT: Well, here again, I have to rely on your individual recollections. I want you to rely on your individual recollections as to what the evidence was.
"I do not intend, nor can I, comment on any portion of the evidence, and as to what the evidence was, I'm repeating myself, I have to leave it up to your individual recollections.
"That's one reason, now, when you get to another point in your question, in reading the charges, verbatim, from the statute, I have to rely on your individual recollections as to what the Court charged you in its entire charge.
"Does that
"FOREMAN PEACE: Now, that was your entire statement from
"THE COURT: from the very beginning.
"FOREMAN PEACE: from the very beginning.
"THE COURT: From the time I read the indictment and the more specific statement to you, all the way through.
"FOREMAN PEACE: Would you, for clarification point, do that again?
"THE COURT: Will you gentlemen approach the bench, please.
"(Bench conference held, out of hearing of court reporter.)
"THE COURT: Ladies and gentlemen, I'll have to rely upon your individual recollections as to what the Court charged you.
"Now, each one of you can discuss with the others everything that wasas far as the evidence was concerned or as far as the law was concerned, that the Court has charged you on. It doesn't *1217 have to be just one person. In fact, each one of you are separate individuals, and entitled to your own opinion.
"You may retire for further deliberations." R. 1425-31.
The jury continued its deliberations from 1:38 p.m. until the jurors were taken to lunch at 1:50 p.m. Deliberations resumed at 2:45 p.m., and the jury returned the verdicts at 2:53 p.m.
Objection to this matter appears in the supplemental record:
"MR. BOWEN [defense counsel]: Judge Jasper calls us to the bench and said, `If y'all want me to, I will reread the wholeregive my complete oral charge.' And as I recall, Mr. Brown [the assistant district attorney]this is not on the record eitheranother one of those instances where the Court Reporter says outside of her presence and hearing.
"MR. WHITE [defense counsel]: Page 1431 of the transcript.
"MR. BOWEN: Mr. Brown says that that's okay with the State to reread the whole charge. And we objected to it and told the Judge that they were apparently having a problem withwhat they perceived to be the vicarious liability on the part of the defendant and that needs to be cleared up. But we objected to just giving the whole oral charge.... And the judge elected not to do anything. He just told them to rely on their recollection of the charge and go back and deliberate." Supp.R. 9-10.
The circuit court[5] accepted these objections as "accurate" and as "properly preserv[ing this issue] for appellate review." Supp.R. 12, 23, 25.
Reversible error was committed by the trial judge's failure to adequately respond to the jury's question and to clarify the confusion concerning the principles of liability involved in this case.
Rule 22.2, A.R.Crim.P., provides, in pertinent part:
"After the jurors have retired to consider their verdict, ... if they or any party requests additional instructions, the court may recall the jurors to the courtroom and ... give appropriate additional instructions. The court may also ... give other instructions, so as not to give undue prominence to the particular ... instructions requested."
"[W]hile deciding whether to grant a jury's request for additional instructions or reinstruction lies within the discretion of the trial court, Moon v. Nolen, 294 Ala. 454, 318 So.2d 690 (Ala.1975), the better practice would be for the trial court to accede to such a request. Ole South Bldg. Supply Corp. v. Pilgrim, 425 So.2d 1086 (Ala.1983); Nichols v. Seaboard Coastline R.R., 341 So.2d 671 (Ala.197[6]) (Bloodworth J., concurring specially)." Merrell v. Joe Bullard Oldsmobile, Inc., 529 So.2d 943, 948 n. 2 (Ala.1988) (emphasis added).
"When a jury requests additional instructions the recommended practice is for the trial court to remain within the area of the specific request in making his response. East v. State, 339 So.2d 1104, 1106-07 (Ala.Cr.App.1976). A trial judge is not required to repeat any other part of his oral charge when answering a specific inquiry from the jury. White v. State, 195 Ala. 681, 686, 71 So. 452 (1916); Thomas v. State, 393 So.2d 504, 508 (Ala.Cr.App.1981)."
Davis v. State, 440 So.2d 1191, 1195 (Ala. Cr.App.1983), cert. denied, 465 U.S. 1083, 104 S.Ct. 1452, 79 L.Ed.2d 770 (1984). However, it has also been held that the repetition of the court's oral charge at the request of the jury and by agreement of counsel was not error. Stillwell v. State, 41 Ala.App. 503, 504, 137 So.2d 61, 62 (1961).
Here, the trial court abused his discretion and committed reversible error in failing to reinstruct the jury. See American Pamcor, Inc. v. Evans, 288 Ala. 416, 422, 261 So.2d 739, 744 (1972) ("[A]dditional instructions on the law of the case [should be given] when the ends of justice and the circumstances of the case require that this be done. This is especially true when the jury requests further instructions on the law of the case.").
*1218 We recognize that the trial judge did offer to restate his entire oral charge. However, such a statement would not have been a direct response to the specific legal principles about which the jury was confused. The foreman had previously informed the trial judge that one of his prior responses did not answer the jury's question. In addition, the foreman had expressed that the jury was having difficulties with the particular "verbiage" employed by the trial judge in delivering his oral charge. Furthermore, as is discussed in Part III of this opinion, there were errors in other portions of the court's oral charge. Those errors would have been repeated had the trial judge merely reread his prior instructions.
"The [trial] judge is responsible for giving the jury the guidance by which it can make appropriate conclusions from the testimony. This duty is performed by clearly stating the relevant legal criteria." United States v. Garrett, 574 F.2d 778, 782 (3d Cir.), cert. denied, 436 U.S. 919, 98 S.Ct. 2265, 56 L.Ed.2d 759 (1978). "The purpose of instructing the jury is to focus its attention on the essential issues in the case and inform it of the permissible ways in which these issues may be resolved." United States v. Ribaste, 905 F.2d 1140, 1143 (8th Cir.1990).
"We have stated that `"[t]he necessity, extent and character of additional instructions are matters within the sound discretion of the trial court."' United States v. Collom, 614 F.2d 624, 631 (9th Cir.1979) (Collum), cert. denied, 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980), quoting Wilson v. United States, 422 F.2d 1303, 1304 (9th Cir.1970). At the same time, the district court has the responsibility to eliminate confusion when a jury asks for clarification of a particular issue. See United States v. McCall, 592 F.2d 1066, 1068 (9th Cir.) (per curiam), cert. denied, 441 U.S. 936, 99 S.Ct. 2061, 60 L.Ed.2d 665 (1979)."
United States v. Hayes, 794 F.2d 1348, 1352 (9th Cir.1986), cert. denied, 479 U.S. 1086, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987).
"A trial judge has some obligation to make reasonable efforts to answer a question from the jury. Bollenbach v. United States, 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350 (1946). `When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy.' Id. at 612-613, 66 S.Ct. at 405. See United States v. Clavey, 565 F.2d 111, 118 (7th Cir.1977), modified on other grounds, 578 F.2d 1219 (7th Cir.) (en banc), cert. denied, 439 U.S. 954, 99 S.Ct. 351, 58 L.Ed.2d 345 (1978)."
United States v. Rodriguez, 765 F.2d 1546, 1553 (11th Cir.1985).
"While the law in this circuit as in others is that the decision whether and how to reinstruct a jury is within the discretion of the trial court, ... there are necessarily limits on that discretion.... [W]hen a jury shows confusion, a trial judge is under an obligation to respond and is not, in responding, bound by the standard instruction[.] ... Particularly where a difficult legal issue ... is the subject of the jury's inquiry, the trial court should carefully inform the jury of the law, and not allow the troubled jury to rely on a layman's interpretation of a superficially simple but actually complex statute."
United States v. Bolden, 514 F.2d 1301, 1308-09 (D.C.Cir.1975). "[W]hen a deliberating jury affirmatively indicates to the trial court that it does not understand an element of the offense charged or some other matter of law central to the guilt or innocence of the accused, the court is obligated to clarify the matter for the jury in a concrete and unambiguous manner." People v. Kittrell, 786 P.2d 467, 470 (Colo.App. 1989). "Where the jury raises an explicit question on a point of law arising from facts over which there is doubt or confusion, the court should attempt to clarify the issue in the minds of the jury members.... `This is true even though the jury was initially given proper instructions.'" People v. Sanders, 127 Ill.App.3d 471, 82 Ill. Dec. 753, 469 N.E.2d 287, 290 (1984). See also United States v. Zabic, 745 F.2d 464, 475 (7th Cir.1984).
The pivotal and major issue the jury had to decide was Deutcsh's liability for the *1219 actions of other employees of the Birmingham Police Department. That decision involved the application of legal principles that are specifically defined by statute and that are not the subject of general public knowledge. See Ala.Code 1975, § 13A-2-20 and § 13A-2-2-23. The facts of this case are numerous, confusing, and subject to various interpretations. We have set out a relatively brief summary of the more significant of those facts in Part V of this opinion. At trial those facts were presented to the jury in a disorganized and jumbled fashion which may have been due, at least partially, to the very nature of the alleged offense. Those facts do not all point in one direction. The evidence of Deutcsh's guilt is entirely circumstantial and is far from being as strong and clear as the State argues. On the other hand, the evidence of Deutcsh's innocence is not as obvious as the defense maintains.
Consequently, any ambiguity and uncertainty in the jury's understanding of the principles of liability involved in this case rendered the decision of the jury virtually meaningless. "The adequacy of the trial court's instruction must always be measured by the evidence and the issues raised there." United States v. Bigham, 812 F.2d 943, 949 (5th Cir.1987).
Repeated readings of the entire record in this case convince this Court that the jury had significant questions about principles of law that were never adequately addressed by the trial judge.
"The difficulty of formulating clarifying instructions so as to avoid incomprehensibility is one which we readily recognize. `Because of the very commonness of [some pertinent] words, the straining for making the clear more clear has the trap of producing complexity and consequent confusion.' [United States v. Lawson, 507 F.2d 433, 442 (7th Cir.1974), cert. denied, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975)]. Nevertheless, where the articulation of the law is essential to the trial's propriety, the task cannot be avoided, as difficult as it may be. It would be, we reluctantly admit, unrealistic to think that every juror understands every concept to which he or she is exposed in the court's charge. The best we can do under our adversary system is to see that the necessarily applicable law is made available to the jury in as understandable as possible form."
United States v. Barclay, 560 F.2d 812, 816 (7th Cir.1977). See also United States v. Washington, 819 F.2d 221, 226 (9th Cir. 1987) ("a conviction should not rest on ambiguous and equivocal jury instructions on a basic issue").
Despite the fact that the judgment of the circuit court must be reversed for this reason, there are additional issues which must be answered on this appeal.

III.
The trial judge erred in instructing the jury on the essential elements of the charged offense.
The trial judge's instructions on the elements of the offense, including the reading of the statute, constitute only five pages of the transcript. R. 1408-12. Even the prosecutor noted that the oral charge was "relatively brief." Supp.R. 12.
After charging the jury on the elements of intent and knowledge, the trial judge stated:
"But, we also have the element of tamper. Tamper simply means to meddle, alter, or change.
"And ladies and gentlemen, the question is not necessarily the materiality of the charge, but it must be that the record was altered, injured, mutilated or destroyed, either in whole or in part, intentionally." R. 1412.
First, § 13A-10-12, which is set out in Part I of this opinion, defines the crime of "tampering with governmental records." Subsections (a)(1) and (a)(2) of § 13A-10-12 are "merely two different methods of proving the same offense"tampering with governmental records. They are "merely alternative methods of proving the same crime, and therefore, [do] not constitute separate offenses." Sisson v. State, 528 So.2d 1159, 1162 (Ala.1988) ("Section 32-5A-191(a)(1) and (2) are merely two different *1220 methods of proving the same offense driving under the influence.").
As we have noted, the trial judge did read the statute to the jury on three separate occasions. On one occasion, he charged the jury that the two sections of the indictment constitute "two separate offenses." R. 1408. However, in charging the jury on the elements of the offense he did not distinguish the elements of subsections (a)(1) and (a)(2). This injected considerable additional confusion into an already complicated legal and factual case.
Second, the trial judge erroneously instructed the jury that an element of the offense of tampering with governmental records was the element of "tamper ... [which] simply means to meddle, alter, or change." Although the criminal offense is "tampering with governmental records," the Alabama Legislature did not make "tampering" a specific element of that offense. The judge's use of the terms "tamper" and "meddle" presents significant difficulty in and of itself when considered in connection with charging a violation of subsection (a)(1).[6]
Third, error is also found in the fact that the trial judge did not charge that the alteration or change involved in a violation of subsection (a)(1) must be false. The statute condemns the false alteration of a government record, not merely any alteration. § 13A-10-12(a)(1). The language of § 13A-10-12(a)(1) "covers any kind of falsification except wholesale invention." Model Penal Code § 241.8 at 189 (1980). We do not reverse on this ground because this particular objection was not advanced at trial.
Fourth, in connection with subsection (a)(2), the trial judge erred in instructing the jury that "the question is not necessarily the materiality of the change." R. 1412. Deutcsh was charged with a violation of subsection (a)(2), which condemns any knowing act whereby a person "intentionally destroys, mutilates, conceals, removes or otherwise substantially impairs the verity or availability of any governmental record." (Emphasis added). Under this subsection, the intentional destruction, mutilation, concealment, or removal or a governmental record is criminal only if such action "substantially impairs the verity or availability" of the record.[7] The commentary *1221 to § 13A-10-12 states that this section "covers three distinct types of acts: (1) falsely altering governmental records, (2) substantially impairing the availability of governmental records, and (3) refusing to deliver up such records on request." (Emphasis added).
A comparison of § 13A-10-12 with the former statute condemning the defacing or destruction of public records makes this abundantly clear. Alabama Code 1975, § 13-5-10, defined the crime of "defacing or destroying records" and provided:
"Whoever wilfully, maliciously or fraudulently alters, defaces, injures, mutilates or destroys the whole or any part of any record, authorized to be made by any law of this state, ... shall, on conviction, be imprisoned in the penitentiary not less than one nor more than five years."
Under that section, the alteration of the record need not have been material. Dutton v. State, 25 Ala.App. 472, 474, 148 So. 876, 878 (1933),[8] overruled on other grounds, Wilson v. State, 371 So.2d 932 (Ala.Cr.App.1978). That section was repealed by the adoption of the Alabama Criminal Code. See Volume 12, Code of Alabama 1975 at 2. The inclusion of the phrase "substantially impairs the verity or availability" in § 13A-10-12(a)(2) distinguishes the current statute from its predecessor and injects the concept of "substantial impairment" into the crime. Dutton has no application to the present statute.
"The touchstone of legislative construction is to ascertain and effectuate the intent of the legislature as expressed in the statute.... Moreover, in determining legislative intent, courts may look to the history of the statute and the purpose sought to be accomplished." Bowlin Horn v. Citizens Hospital, 425 So.2d 1065, 1070 (Ala. 1982). "If the language of the statute is clear and unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect." Tuscaloosa County Comm'n v. Deputy Sheriffs Ass'n of Tuscaloosa County, 589 So.2d 687, 689 (Ala. 1991). Here, it cannot reasonably be argued that the phrase "substantially impairs the verity or availability" is restricted only to acts other than those involving the destruction, mutilation, concealment, or removal or a government record.
In addition to the history of the statute, application of another fundamental principle of statutory construction requires the same result. "`Where several words are followed by a clause as much applicable to the first and other words as to the last, the clause should be read as applicable to all.' [82 C.J.S. Statutes § 334 (1953) ]. See also 2A Sutherland Statutory Construction § 47.33 (Sands 4th ed. 1973)." White v. Knight, 424 So.2d 566, 568 (Ala.1982).
Although the error in connection with the erroneous charge on subsection (a)(2) of § 13A-10-12 was properly preserved for appellate review, the error is harmless because we have concluded that Deutcsh stands convicted only of the crime of tampering as defined in subsection (a)(1). An error in a court's oral charge as to one offense is harmless where the defendant is not convicted of that offense. See Ward v. State, 153 Ala. 9, 11, 45 So. 221, 222 (1907). However this error does stand as yet another indication of the wholesale confusion presented by the oral charge of the trial court.

*1222 IV.
The trial court did not commit reversible error in admitting into evidence testimony of statements attributed to Deutcsh's alleged coconspirators before proof of the existence of any conspiracy had been introduced.
"Where proof of a conspiracy exists, any act or statement by an accused's co-conspirator in the commission of the crime, done or made before the commission of the crime, during the existence of the conspiracy and in the furtherance of a plan or design, is admissible against the accused. A co-conspirator's act or statement after the commission of the crime ordinarily is not admissible against the accused.
"Before a co-conspirator's statement or act will be admissible against the accused, proof must be made of the conspiracy. Such proof may consist solely of circumstantial evidence. The trial court has wide discretion in the admission of evidence tending to show the conspiracy.
"Although proof of the conspiracy should be made before admittance against the accused of the co-conspirator's act or statement, subsequent proof of the conspiracy cures any error in prematurely admitting the act or statement."
C. Gamble, McElroy's Alabama Evidence §§ 195.03(1), (2) (4th ed. 1991) (footnotes omitted).
"It is well settled that before a co-conspirator's testimony may be admitted, there must be prima facie grounds for believing in the existence of the conspiracy.... While it is preferable that a co-conspirator testify after the prima facie showing of the existence of a conspiracy, such order of proof is not mandatory. The order of proof requirement is for the purpose of expediting the trial and saving the valuable time of the trial court, rather than protecting or securing any supposed right a defendant might have. Smith v. State, 8 Ala.App. 187, 62 So. 575 (1913)."
Morton v. State, 338 So.2d 423, 425 (Ala. Cr.App.) cert. denied, 338 So.2d 428 (Ala. 1976). See also United States v. Richardson, 694 F.2d 251 (11th Cir.1982); Annot., 46 A.L.R.3d 1148 at 141 (Supp.1991) citing cases "recognizing or holding that conditional admission of extra judicial statements is proper, subject to subsequent fulfillment of requirement that conspiracy be proved."
The existence of the conspiracy must be proved by evidence which does not include the statements of the coconspirator and which may consist solely of circumstantial evidence.
"`This proof of the existence of the conspiracy must be independent of the statements of the defendant's co-conspirators.... The initial existence of a conspiracy may not be proved by the statements of the co-conspirators.' Ingle v. State, 415 So.2d 1225, 1228-29 (Ala.Cr. App.1982).
"Although the existence of a conspiracy may be and usually is shown through circumstantial evidence, Muller v. State, 44 Ala.App. 637, 642, 218 So.2d 698, 703 (1968), cert. denied, 283 Ala. 717, 218 So.2d 704 (1969), `"conspiracies cannot be established by a mere suspicion," and... relationships and associations between the parties which are natural and reasonable according to their habits and modes of life do not constitute evidence of conspiracy.' Pharris v. Commonwealth, 198 Ky. 51, 55, 248 S.W. 230, 232 (1923)."
Bright v. State, 485 So.2d 398, 401-02 (Ala. Cr.App.1986). "[T]o allow such testimony to go to the jury, a foundation must be laid by proof sufficient, in the opinion of the judge presiding, to establish, prima facie, the existence of such conspiracy." Beech v. State, 203 Ala. 529, 530, 84 So. 753 (1919) (quoting McAnally v. State, 74 Ala. 9, 16 (1883)). "A conspiracy is rarely proven by positive or direct testimony but usually by circumstances." Muller v. State, 44 Ala. App. 637, 642, 218 So.2d 698, 703 (1968), cert. denied, 283 Ala. 717, 218 So.2d 704 (1969). The existence of a conspiracy "may be inferred from all of the facts and circumstances surrounding the transaction." *1223 Hanson v. State, 27 Ala.App. 147, 149, 168 So. 698, 700, cert. denied, 232 Ala. 585, 168 So. 700 (1936). "It is well-settled that a conspiracy need not be proved by direct and positive evidence, but may be determined from the conduct and relationship of the parties, from relevant testimony, from the circumstances surrounding the act, and from the conduct of the accused and his confederates subsequent to the act." Lewis v. State, 414 So.2d 135, 140 (Ala.Cr. App.), cert. denied, 414 So.2d 140 (Ala. 1982). A conspiracy "need not be proven by positive testimony. It is rarely so to be shown. It must be determined by the triers of fact from the conduct of the parties and all the relative testimony ...; that of the attendant circumstances applying and accompanying the doing of the act, and from the conduct of the defendant subsequent to the criminal act." Lash v. State, 244 Ala. 48, 53, 14 So.2d 229, 232 (1943).
"The coconspirators' exception [to the rule of evidence excluding hearsay statements] may be simply stated: where two or more persons are alleged to have conspired to commit a crime or cause injury to another, any statement made by one, pursuant to or in furtherance of the conspiratorial purpose, is admissible in evidence against any other member of the conspiracy.
"In order for the extrajudicial statement of a coconspirator to qualify under the coconspirators' exception, three distinct conditions must be met. First, the statement must have been made in furtherance of the conspiracy. Second, the statement must have been made during the pendency of the conspiracy. Finally,... the existence of the conspiracy must be shown by independent evidence.
"Why the necessity of independent evidence of the conspiracy? As is the case with the basis for the exclusion of hearsay evidence in general, the reason for requiring independent evidence of conspiracy would seem to lie in the fact that hearsay testimony as to the extrajudicial statements of a coconspirator is not subject to the tests which can ordinarily be applied for the ascertainment of its truth. Thus, although variously expressed, the underlying rationale of the requirement of independent evidence is the express or implied fear that a defendant might otherwise be convicted, or held liable in damages, solely on the basis of evidence which he has no opportunity to impeach or refute.
"....
"... With little exception, the courts in the criminal cases which have considered the question have held or recognized that the independent evidence must establish a prima facie case of conspiracy."
Annot., Necessity and Sufficiency of Independent Evidence of Conspiracy to Allow Admission of Extrajudicial Statements of Coconspirators, 46 A.L.R.3rd 1148, 1155-56, 1161 (1972) (footnotes omitted).
The quantum of proof required to demonstrate the existence of a conspiracy in order to permit the admission of the statements of the coconspirators is that the proof must establish a prima facie case of conspiracy. 46 A.L.R.3d 1148 at § 5.
"Prima facie evidence may be defined as evidence which suffices for proof of a particular fact until the fact is contradicted by other evidence. Tittle v. State, 252 Ala. 377, 41 So.2d 295 (1949). Prima facie evidence is the quantum of evidence necessary to prevent an action from being dismissed for failure to state a claim. See J. Hazard, Civil Procedure (1978). If no other evidence is submitted to contradict the prima facie evidence, the party presenting the evidence is entitled to judgment. In other words, a prima facie case meets the party's burden of proceeding, and if no contradictory evidence is permitted, it also meets his or her burden of proof."
Lavett v. Lavett, 414 So.2d 907, 911-12 (Ala.1982), overruled on other grounds, McBride v. McBride, 548 So.2d 155 (Ala. 1989). "`Prima facie evidence' means that which brings about a measure of proof which, unless it is self contradictory or is contradicted by the defense, would support the jury's inferring the existence of one or more elements of a crime." Kizziah v. State, 42 Ala.App. 303, 305, 162 So.2d 889, 891 (1964).

*1224 V.
Applying the principles collected in Part IV of this opinion to the facts presented in the record on appeal, and viewing those facts in the light most favorable to the State, see Ex parte Bailey, 590 So.2d 354, 357 (Ala.1991), we find that the prosecution did present at least minimally sufficient evidence to support a prima facie finding of the existence of a conspiracy between Chief Deutcsh, police officers Mike Lee[9] and Robert Howell,[10] and assistant jail administrator Robert Stone.[11] There is no evidence that Birmingham Mayor Richard Arrington was involved in any aspect of any conspiracy.
In an attempt to achieve some degree of clarity, we have set out the facts presented by the prosecution at trial in the following chronological order.
July 4, 1990:
Erica Arrington, the then eighteen-year-old daughter of the mayor of the City of Birmingham, was arrested at either 11:18 on the night of July 4 or 1:03 on the morning of July 5, 1990,[12] in the Southside area of Birmingham. She was charged with disorderly conduct, resisting arrest, and inciting a riot.[13] Along with Miss Arrington, William Griggs and David Parkman were also arrested at approximately that same time that morning by Birmingham Police Officer Jerry Bahakel.
July 5, 1990:
Shortly after her arrest, Miss Arrington was taken to the "booking/intake" area of the Birmingham City Jail where she was booked, fingerprinted, photographed, and seen by a nurse. Her personal property was inventoried and taken, and she was given a property receipt. At the jail, at least one copy was made of her arrest report, and the original was returned to the arresting officer. Her name was entered in the "jail log-in book," the index, and the docket book.
The jail log or "jail log-in book" is also identified as the "city jail log sheet." R. 919-20. It is "a loose-leaf clip-type board that we can keep track of the prisoners and the processing through" at the jail. R. 475. It is "strictly informal" and is not an "official record." R. 475-76.
The index is "official" and serves as an alphabetical list of "every inmate that comes into the jail." R. 476.
The docket book is "a main, permanent record [consisting of loose-leaf pages] that is maintained [at the jail] with all the information pertinent to the arrest. It has the individual's name, his birth date, his home address, the charges, bonds, fines, etc." R. 474-75.
Chief Jail Administrator Frank Alexander testified that the index book and the docket book are public records which are "official records, and ... they're supposed to be sacrosanct. The[re's] supposed to be no changes in them, whatsoever. ... [T]he integrity of them can't be questioned." R. 489-90.
Miss Arrington was fingerprinted as part of the booking process. A fingerprint card (probably two) was typed at the jail and she was "logged" on "a fingerprint log." R. 477, 496. Sometime early that same morning, the original fingerprint card, the original fingerprint log, and the photographs (with a copy of the fingerprint log) were sent to the police photography laboratory.
*1225 The photographs were logged in on the fingerprint log.
The jail kept the originals of the docket book and the index book and a copy of the fingerprint log.
Miss Arrington made bond and was released from jail at approximately 2:00 a.m.
6:30 A.M.: Janice Brown was employed as a supervisor in the front office of the "control" area at the city jail. On July 5, 1990, her shift began at 6:30 a.m. Immediately after roll call, she first saw Erica Arrington's name in the docket book, but did not recognize its significance. Sometime before 9:00 that morning, she had a telephone conversation with Norman Glass, the clerk of municipal court, about Miss Arrington's arrest. Janice Brown testified that everybody in the jail knew about the arrest of the mayor's daughter that day. At trial, she identified the original page from the docket book containing Miss Arrington's name, and testified that it was different from when she first observed it in that "[i]t has creases, where it's folded." R. 669.
7:00 A.M.: Computer data entry clerk Diane Brown (Janice Brown's sister-in-law), arrived at work in the front office of the city jail. She worked in the upstairs control area of the jail. She testified that "almost immediately" after arriving at work she learned that the mayor's daughter had been arrested. Shortly thereafter she noticed that the information about Miss Arrington's arrest had been logged into the computer by the preceding shift.
Information was taken from the arrest report and keyed into the computer by the data entry operators at the jail to generate the municipal court record reference file, also known as M.C.C.M. (Municipal Court Case Management). This reference file was "secure" and could not be deleted.
Every time an arrest report is "keyed in" it automatically generates another computer reference file which was only referred to at trial as "M.I.A.R.," which contained "basically the same information as the court file did." R. 724, 727.
8:00 A.M.: Between 8:00 and 8:15 that morning, Birmingham News reporter Walter Bryant checked the docket book and the incident reports at the city jail to see who had been arrested and to look for "interesting finds." R. 840-41. He testified that he noticed a charge of "inciting to riot" on the docket book at that time but did not remember seeing the name "Arrington." R. 842, 856. He checked the incident reports in the record room but did not see any charge of inciting to riot. Bryant returned to his office at the News around 9:15 to 9:30 that morning.
9:00 A.M.: Computer operator Diane Brown testified that she first saw Lieutenant Robert Stone, the Assistant Jail Administrator, around 9:00 that morning, when he came to the upstairs control area of the city jail. He was accompanied by Sergeants Mike Lee and Robert Howell. These three menStone, Howell, and Leeare Deutcsh's alleged coconspirators.
Sgt. Lee was assigned to the Chief's office. He "handled administrative duties, handled telephone calls, mail, stuff like that" for Deutcsh. R. 525. His desk was in the Chief's conference room. At the time of trial, Lee was still assigned to the same duties. R. 526-27.
Sgt. Howell was assigned to the Patrol Bureau Staff working in an administrative capacity. He reported to Deputy Chief Newfield, who was the commander of the Patrol Bureau. His office was located near and on the same floor as the Chief's office. In August or September 1990, Sgt. Howell was given a provisional appointment to the rank of lieutenant. The week before Deutcsh's trial in May 1991, that provisional promotion was made official. That promotion was according to the rules and regulations of the Jefferson County Personnel Board and was not under the control of the police department.
Diane Brown testified that Lt. Stone asked her if she "could ... take a record out of the machine [computer]." R. 729. She "took the reference file out, but ... told him [she] was unable to take out the municipal court record," and that she would have to call the municipal court *1226 clerk, Norman Glass. R. 730-31. She deleted the M.I.A.R. reference file that was maintained at the jail. R. 730. She knew which file to remove because either Stone or Howell gave her a copy of Miss Arrington's arrest report. R. 730.
Diane Brown also testified that during this time, Sgt. Howell asked, "Has the press been there?" When she responded, "Yes, I had heard Mr. Bryant, from the News, down there earlier that morning," Howell said, "I guess we'll have to call them." R. 732-34. Diane Brown stated that she observed Janice Brown rewriting a docket page during this time.
Stone, Howell, and Lee remained in the control area with Diane Brown for just "a few minutes." R. 744. Sometime later that day, Diane Brown replaced the M.I.A.R. reference file at Lt. Stone's request.
Jackie Adley was assigned to the Records Bureau at the police department and was responsible for "mail" delivery and pick up. The "mail" involved information regarding arrests. The following facts were presented by Adley at trial. Between 9:00 and 9:30 on the morning of July 5, she went to the Chief's office as usual. On that occasion, Sgt. Lee told her that he needed Adley "to pull some, an arrest report for Erica Arrington from the files downstairs in the records department [the Records Bureau]" and that "he needed the originals of any and all reports or documents that we had." R. 1041. Adley testified that Lee told her that he needed "anything and everything" she had on Miss Arrington. R. 1061.
Adley and Lee went to the Records Bureau to retrieve the information but were unable to locate any without a case number. Adley testified that she "entered into the computer and didn't get any information about the case." R. 1041. After discussing the matter, Adley and Lee went to the Southside precinct station to obtain Miss Arrington's case number.
On the way to the precinct, Lee told Adley that he "needed [Adley] to get any and all documents or reports that they had on Erica Arrington's case and bring them to him," that Adley was not to talk to anybody, and if anyone asked, Adley was to just say that "they were as per Chief Deutcsh." R. 1045-46. Sgt. Lee remained in the car while Adley went inside the station.
When Sergeant Kenneth Davis asked Adley why she needed all the documents and reports relating to Miss Arrington, Adley responded that "Sgt. Lee told [her] to come in here and get them and ... that they were as per the chief." R. 1047. Adley returned to the car in 15 or 20 minutes with copies of the reports.
Adley and Lee returned to the Records Bureau where, having obtained the case number, they retrieved the file folder and original reports on Miss Arrington's arrest. Two male suspects had been arrested along with Miss Arrington. All three suspects had the same case number.
Lee took all three original reports, including the original report in the Arrington case, and did not replace the originals with copies as proper procedure required. When questioned by Adley about this, Lee said he needed the originals. Before Lee left, he asked Adley if there were any more copies of the report. Adley told him that there were some in a back-up file, on the media news docket file. Lee indicated that he needed to get those copies as well. Lee and Adley went to the data entry department and looked on the media docket file. They found the two reports on the males but none on Miss Arrington. Adley, at Lee's request, took the two reports off the media docket file and gave them to Lee. Before Lee left, Adley told Lee that she needed to talk to her supervisor about removing the original reports "because we're not allowed to do that." R. 1054. Lee said, "Don't talk to anybody about it. ... Tell anybody if they have any questions to see Chief Deutcsh or me, if they have any questions." R. 1054. After Lee left with the documents, Adley immediately told her supervisor, Lt. Eaton, who told Adley that she would handle the matter, and something to the effect of "don't worry about it." R. 1064.
*1227 Lee and Howell returned to the data entry office shortly, and Howell asked Adley if there were any more reports on Miss Arrington in data entry or in records. Adley told him that there were some reports in the back-up file. Howell said, "I need you to pull all the reports, any report that you see or that have any information about the Erica Arrington case, or under this case number. I need you to pull all those reports." R. 1055-56. Howell and Lee then left and Adley began gathering the reports. Adley testified, "I looked on the media docket file, and at that time the Arrington arrest report had been placed on there. And I checked it off, and gathered all the reports out of the back-up file." R. 1056. Adley found copies of reports she had earlier given Lee. She took these copies to Lee's office where she left them along with a note because Lee was not there at that time.
According to Deutcsh's statement on October 4, 1990, given to investigators for the Alabama Bureau of Investigation, Mayor Arrington telephoned Deutcsh at 9:55 on the morning of July 5 at his office, informed Deutcsh of a riot on Southside and the arrest of Arrington's daughter, and requested an "in depth report immediately." R.2025. Deutcsh's statement continues:
"I told the mayor you have caught me with egg on my face, I know nothing about this. I then called to Sgt Lee who[se] office is next to my office, Sgt. Lee meet me at my door. I told him to gather all the information he could reference this. Lt. Bobby Howell was there talking to Lee about Alabama Football. I told Lt. Howell to go with Sgt. Lee. Before I talked with Howell and Lee, I called the city jail to see if Erica Arrington had been arrested, I called for Frank Alexander but he wasn't there. Stone answered the phone. I asked him if he knew about Erica Arrington being arrested or a lot of people arrested in a riot. Stone said he did not know anything but he would check and call right back. In about five minutes he called back and said there was an Erica Arrington arrested last night, he gave the three charges and that she was bonded out. This is when I called for Mike Lee and told him and Bobby Howell to find out what they could. They left around 10:15 A.M. Bobby Howell returned to my office just right before lunch. He had the incident report covering Erica Arrington's arrest. Howell pointed out to me that the incident report had been whited out in the narrative section. I called the FBI office and spoke with their evidence technician. I asked if the lab could raise white out and determine what was under it. He said he was sure they could but he would check and call me back. He called back to say they could. Someone mentioned the state Forensic lab and I called them and they said they could handle it. Someone, I don't remember who, carried the incident report to the state lab.
"Around 2 p.m. I returned to my office from lunch. Mayor Arrington, Capt Webb Co. Int. [sic] Affairs, Sgt. Lee, Lt. Howell and my secretary Sandra Evers were there. At this time Howell and Lee briefed the Mayor and myself as to what they found out. It appeared they had some documents with them but I don't know what they were. During this briefing the mayor's daughter called and spoke to the mayor. When the mayor finished talking with her, he told me that she wanted to file a formal complaint. While the mayor was talking on the phone everyone left the room and the door was pulled to. I told Capt. Webb to start the investigation and take a female officer with you. Everyone left. Lee went back to his desk, Howell went on with what he was doing. I told the Mayor I would let him know what we find out." R.2025-28.
10:00 A.M.: Sandra Evers, Deutcsh's secretary, testified that she saw Howell and Lee enter the Chief's office for first time on the morning of July 5th around 10:00. She testified that they returned two or three times between 10:30 and 12:00 that morning. She also testified that there was nothing unusual about either Howell or Lee being in the Chief's office. Ms. Evers *1228 stated that around 10:00 a.m., Lt. Stone brought "a paper" and placed it on Lee's desk.
At approximately 10:00 or 10:30, fingerprint technician Marion Owens first saw the original fingerprint log in Miss Arrington's case. She first saw the fingerprint card 10 to 15 minutes later. At that time, it had already been placed in the book in which the logs are kept permanently. Ms. Owens testified that Lt. Stone telephoned her during this time and "asked [her] to pull the fingerprint cards on Erica Arrington, and to leave the copy of the arrest report attached, that Mike Lee, from the Chief's office, would be over, and to treat it as though it was not an arrest, and it was per the Chief's office." R. 757, 773. Approximately five to ten minutes after Stone called, Sgts. Lee and Howell came to her office and got the fingerprint cards. Owens testified that Howell "told [her] to line through Erica Arrington's name on the fingerprint log sheet, and he proceeded to leave." R. 759.
Lee and Howell returned five minutes later. Owens testified that Howell asked her, "You did take her name off the [fingerprint log] sheet?" R. 759, 774. After she indicated that she had, "they said, `Good,' and they both left." R. 759. Owens had lined through Miss Arrington's name, initialed it, and indicated that she had given the cards to Howell and Lee. After they left, she "took liquid paper and whited out her name on the fingerprint log sheet," although neither Howell or Lee had specifically made that request. R. 760, 774.
Ms. Owens testified that there was nothing unusual about having additions or writings or "things like that" on the fingerprint log, which was used as a worksheet. R. 767. She also stated that the standard operating procedure for the removal of fingerprint cards was not followed in this case, and that she did not ask Howell or Lee to follow that procedure. That procedure requires that when an original document is removed, it must "be signed out, and then a copy of it put in their place." R. 568.
Between 10:00 A.M. and 11:00 A.M.: Sgts. Howell and Lee came to the office of Connie Freeman, photography color lab technician. Ms. Freeman testified that Howell handed her "the piece of paper with a picture number on it, and said he needed this picture." R. 792. Ms. Freeman stated that she retrieved Miss Arrington's photographic print from her files and said "`Oh, she is related.' And he informed me just give it to him." R. 793. When Howell said, "I need the negative, too," Freeman replied, "It's going to take someone higher than you to get that." Ms. Freeman testified that Howell said "very emphatically,... `It's for the Chief, Connie.'" Ms. Freeman responded, "`That's who I have to hear;' or, `That's what I had to hear.'" R. 793-94. Freeman cut and separated the negative of Miss Arrington from a strip of negatives and gave it to Howell. Ms. Freeman testified that Howell asked her "something about something to do with fingerprints, and I said, `You know where that is. That doesn't have anything to do with me.'" R. 794. Howell and Freeman then left. Ms. Freeman testified that no one had ever before asked her for a negative.
11:00 A.M. (or 12:00R. 698, 699): Jail supervisor Janice Brown testified that she saw Howell and Lee in the upstairs front office in the control area of the jail with Lt. Stone and computer operator Diane Brown about this time. She testified that Stone asked her to get the docket page with Erica Arrington's name on it. At Stone's direction, she removed that page from the loose-leaf docket book and recopied the entire page onto a clean page omitting any information concerning Miss Arrington. Janice Brown testified that when she questioned "why we were doing this," Howell said, something like "`It's for the Chief's office,' or `Orders from the Chief.'" R. 691. She left the original docket sheet on the counter in an unfolded condition in the upstairs part of the control area of the jail and placed the copy in the docket book in the downstairs portion of the control area at Stone's direction while Howell and Lee were present. She testified that there was a photocopying machine located nearby in that area of the jail.
*1229 At Lt. Stone's direction, Janice Brown also put white-out over Miss Arrington's name in the index book. Janice Brown testified that when she left work that day, which was probably around 2:30, Miss Arrington's name still whited-out.
11:30 A.M. or 12:00 noon: Reporter Bryant had a conversation with Captain Dennis Blass and Lt. Stone about locating information about Miss Arrington's arrest. Bryant testified that Stone told him that the original docket page was on Lee's desk.
Captain Dennis Blass was in charge of the Records Bureau of the Birmingham Police Department. Sometime during the morning of July 5, he discovered that records had been removed and that the check-out procedure had not been followed. He "immediately" informed his acting supervisor, Deputy Chief Johnson. R. 606, 615. Subsequently, he attempted to see Deutcsh, who had apparently left the building at that time. Later that afternoon, Blass did see Deutcsh. During the course of that conversation, Deutcsh asked him if the records were back and Blass replied that they were. According to Blass, the next day, Deutcsh asked, "Dennis, the records are back and everything's okay?" to which Blass responded "Yes." R. 607.
Blass testified that Sgt. Howell obtained the arrest report from the Records Bureau on July 5th because Howell's name was on the "suspect log" which is "maintained by the police department for people who want to check out the arrest report log." R. 625, 626, 629. Blass did not know exactly when Howell's name had been entered on that log, although he knew that it was some time after "12:30, 12:00, somewhere in there." R. 637, 638.
12:00 noon (or shortly thereafter): Sometime between 11:00 a.m. and 1:00 p.m., reporter Bryant, upon instructions from his supervisor at The Birmingham News, Randy Henderson, returned to the city jail. The News had received an anonymous telephone call about Miss Arrington's arrest and that was why Bryant had been sent back to the jail. Bryant testified that when he checked the docket book he "could no longer find anyone charged with inciting to riot," R. 846 and that it was obvious that a docketing number had been skipped because the numbers went from 100 to 102. R. 863. Miss Arrington's docket number was "0101." R. 488. Bryant telephoned his supervisor and again returned to his office at the News.
12:15 P.M.: Secretary Evers went to lunch when Sgt. Lee returned to his office about this time. Chief Deutcsh had already left for lunch.
12:30 P.M.: Sgt. Pat Curry, commander of the evidence technicians and the photographic lab, testified that about this time he responded to a call from the Chief's office requesting an evidence technician. He testified that Deutcsh asked him if the police department had the capability of determining what the original writings were on a document to which liquid paper had been applied. Curry stated that, in his presence, Deutcsh telephoned the local F.B.I. office. Curry telephoned the State Department of Forensic Sciences in Birmingham. Chief Deutcsh instructed Curry to "treat this as an internal investigation." R. 1023.
Accompanied by Sgt. Howell, Curry then went downstairs to the Records Bureau and obtained the original arrest report on Miss Arrington made by the arresting officer. In obtaining this document, the standard check-out procedure was followed. A copy was made of the original, Howell's name was placed on the copy, and the copy was placed in the file. Curry testified that white-out was on the arrest narrative or arrest information part of the arrest report.
That same day (July 5), Curry took the arrest report to the Department of Forensic Sciences and met with Lawdon Yates, the director of the office. Lamar Miller, the questioned-documents examiner, performed a preliminary analysis to determine whether the original writing could be identified.
Curry kept the original arrest report until the next day (July 6), when he returned to Forensic Sciences and formally submitted the arrest report for analysis at Deutcsh's request.
*1230 Early in the afternoon:
Gilbert Johnston, Jr., attorney for The Birmingham News telephoned assistant Birmingham City attorney Charlie Wyatt after receiving a telephone call from The Birmingham News. Johnson and Wyatt had three telephone conversations that afternoon. After the third conversation with Wyatt, Johnston telephoned Sgt. Lee sometime in the mid-afternoon. Johnston testified that he informed Lee that the News wanted access to the jail docket sheet, and that even though Johnson had been told that the docket sheet would be back in the morning of July 6, the News "thought it was going to make the jail people look rather bad for [the docket sheet] to be gone that long." R. 1115, 1121. Johnson testified that Lee replied, "Well, it's not the jail people. I've got it right here. ... Tell your editor to call me." R. 1115.
1:00-1:30 P.M.: Secretary Evers returned from lunch. The Mayor telephoned Chief Deutcsh's office wanting the 2:00 meeting changed from his office to the Chief's office.
Prior to the time that Deutcsh returned from lunch, Sgts. Howell and Lee, Captain Webb from Internal Affairs, and the Mayor came to Deutcsh's office in preparation for the 2:00 meeting with the Chief.
2:00 P.M.: Chief Deutcsh met with the Mayor, Sgts. Howell and Lee, and Capt. R.L. Webb of the Internal Affairs Division (IAD). Capt. Webb testified that during this meeting, Deutcsh instructed him to begin an investigation concerning an allegation of excessive force in the arrest of Miss Arrington.
2:30 P.M.: Donald R. Sharpe was the photographic lab manager at Birmingham Police Department. He testified that, although he was not sure of the exact time, sometime after 2:00, Howell and Deputy Chief Howard Miller came to his department and asked for Connie Freeman, who had already left for the day. One of the two men handed Sharpe a print and a negative. Sharpe placed the negative on the back of the print, taped it, and placed it on Ms. Freeman's desk. Neither the print nor the negative had been altered.
Sometime after 2:30 P.M.: Adley testified that Sgts. Howell and Lee came to the Records Bureau sometime after 2:30 p.m. Lee handed Adley some reports and told her to place the reports back in the files from which they had been taken. These reports were the two original arrest reports of the males arrested along with Miss Arrington and a copy of Miss Arrington's arrest report. Adley testified that when asked about the copy of the Arrington arrest report, Lee said that "he didn't know, he thought it was upstairs, the Chief had it, or something." R. 1060. The reports had not been altered, but the original of the Arrington arrest report was not returned to Adley.
Between 3:00 P.M. and 4:00 P.M.: Although he does not recall the exact time, sometime after his shift began, Jail Correctional Supervisor William Blackwell saw Howell and Lee in the booking area of the jail. Howell and Lee asked for Major Alexander and then for Lt. Stone. Howell had a yellow 6" × 9" envelope. Blackwell testified that Lee told him that he needed "the book, ... the big book." R. 815. All three men then went to the front office to get the docket book. Blackwell testified that as they approached the front office, they noticed a Birmingham News reporter looking through the docket book. They walked up to the front sally port that one has to go through in order to enter the front office where the docket book was located. Lee motioned for Blackwell to stop and to step out of the sally port area. Blackwell testified that Lee told him that he needed the "whole book." R. 818. While Howell and Lee remained standing behind the door outside the sally port, Blackwell went inside and told the reporter that he needed the docket book. Blackwell took the book to the back office and laid it on the booking office desk countertop. Then Howell took a folded docket sheet out of the yellow envelope. When Howell unfolded the sheet, Blackwell asked Lee what was going on. Blackwell testified that Lee replied that Blackwell "didn't want to know." R. 821, 829. Blackwell stated that Howell took a sheet out of the docket book, folded *1231 it, and put it into the envelope that he had walked in with. He placed the docket sheet he had previously removed from the envelope into the docket book. Miss Arrington's name was on the docket sheet that was placed into the docket book but it had not been on the sheet that was removed. Howell asked Blackwell if her name would be somewhere else. Blackwell told Howell her name would be on the booking log (the city jail log sheet). Howell told him to put her name back on the booking log. Blackwell went to the log, which contained a whited-out space for the time that Miss Arrington had been booked in the jail. The white-out was on a copy of the city jail log sheet and not on the original. At Howell's direction, Blackwell wrote Miss Arrington's name, case number, and charges back on the booking log in the whited-out space while Senior Correctional Supervisor Lieutenant Foster Woodrick called out the information for Blackwell to write on the booking log. Woodrick testified that he observed Howell and Lee talking to Blackwell, and that he heard the statement made, "Put her name back in there." R. 914. Woodrick stated that he held the docket page for Blackwell as Blackwell wrote. Woodrick stated that noticed that the booking log had been "poorly whited out. There was ink still there." R. 915.
After adding the information concerning the Arrington case, Blackwell returned the docket book to the front office. The reporter was still there but Howell and Lee had left. Blackwell testified that on or about the time that this happened, the news reporter told him that the chief's office had told him they were going to give them full cooperation and had given them permission to photograph the docket sheet. At trial, Blackwell identified the original booking log, which had not been altered.
Normal procedure dictated that at the shift change at the jail, the original booking sheet would be taken out of the log book and placed on the jail secretary's desk. A copy of the docket sheet would be made and placed in the log book.
3:15 P.M.: Birmingham News reporter Roy Williams testified that he went to the lobby area of the jail about this time. He had been sent to look for a particular document that he had been told about at the newspaper. At that time, he was aware that there had been discussions between lawyers for the News and the City about a missing docket sheet. He looked in the city jail log book and the docket book. He found a particular sheet that had a skip in sequence, and knew that an entry was missing although there appeared to be no "gaps" in the names, which all appeared to be in order.
3:30 P.M.: Reporter Williams testified that Howell and Lee arrived at the jail about 3:30. They walked in while he was looking at the docket book and spoke to another jail employee. That individual came over to Williams while Williams was looking at the docket book, took the book from him, and took it to Howell and Lee and all three men went into another room. Williams testified he later saw pages being put into and removed from the docket book by some jail employee. Williams testified that Howell and Lee had already gone when the sheet was replaced.
Williams testified that he saw reporter Bryant at the jail around 3:30 or 3:45 p.m., which was about 45 minutes after he arrived. About that time, Williams telephoned Sgt. Lee while reporter Bryant was present. Williams testified that Lee told him that the docket sheet concerning the mayor's daughter was over at the jail. Bryant and Williams then went and looked at the docket book, where they found the entry concerning Miss Arrington. Williams testified that the sheet with the skipped sequence was not there but that there was a sheet that mentioned the mayor's daughter's arrest.
Reporter Bryant testified that about 3:30, he returned to the jail for his third visit that day. He and reporter Williams went in the docket room and looked for the docket sheet. They found no charge of inciting to riot. Bryant again called his supervisor and then remained in the lobby of the jail near the front desk for 30 to 45 *1232 minutes. Then he went to the jail complex to search for Howell and Lee. Bryant, upon being unable to locate Lee, telephoned him from the phone in the lobby of the jail about 3:30 or 4:00. Bryant asked Lee if he knew anything about the arrest of Erica Arrington. Bryant testified that Lee said that he knew nothing about it. Bryant also testified, "I also asked Sergeant Lee where the, if anything had happened to the docket sheet, that we had been told that the docket sheet I had seen at 8:00 a.m. would be returned to the docket book. And he said to go to the jail, and the original docket sheet would be there." R. 853, 865. Bryant returned to the jail and found the original docket sheet. That docket sheet had been folded twice.
4:45: Fingerprint technician Joy Schultz testified that about this time, Miss Arrington's fingerprint cards were brought into her office by Mike Ware, who works in the administrative section of the police department. Schultz put the cards on Ms. Owens' desk because Ms. Owens had already left for the day. Ms. Schultz admitted that she had previously stated that it was Howell who brought back the cards.
July 6:
6:30 A.M.: Although the recopied docket sheet was still in the docket book when she left work the previous day, when Janice Brown returned to work on July 6, the original docket sheet containing Miss Arrington's name was back in book. Also, Miss Arrington's name had been written back on the docket index.
7:00 A.M.: Marion Owens returned to work and discovered Miss Arrington's fingerprint cards on her desk. These were the same cards she had given Howell and Lee the day before. She re-entered the previously whited-out information on the fingerprint log. The documents returned to her desk had not been altered or changed in any way.
When Connie Freeman returned to work, Miss Arrington's photographic print and the negative were on her desk. They had not been changed.
Birmingham News reporter John Archibald had two conversations with Deutcsh on the afternoon of July 6: one over the telephone (for about 10-15 minutes) and one in the Chief's office (for about "maybe an hour"). R. 933, 940. Archibald testified that Deutcsh indicated that there had been nothing unusual about the manner in which the arrest of the mayor's daughter had been handled: "It was handled like any other arrest." R. 935. Archibald testified, "I asked him specifically if the events outlined in the newspaper on July 5th [sic], which were written by Walter Bryant and Bob Blalock, were correct. And I asked him a number of questions about the events that happened then. And he said they were totally false." R. 937. Archibald testified that when asked if the docket page had been removed and replaced with another that made no reference to Erica Arrington, Deutcsh "denied any knowledgehe denied that any replacement had been made. He denied that any swap had been made, and he denied any knowledge of any of the above. ... He said it was ridiculous. He said the newspaper didn't have its facts straight, and was a thousand percent wrong. ... But he said, basically, it was ridiculous and wrong, and the media had the information twelve hours before he did." R. 938. According to Archibald, Deutcsh denied any knowledge of any alterations. He stated that Deutcsh "refused to acknowledge that any such swap took place. Each time the question was posed to him, he would change the subject to the arrest and alleged abuse by the police officer." R. 949. Archibald stated that Deutcsh's exact words were, "That's absolutely one thousand percent wrong. Your paper doesn't know what it's talking about. You're treading on very thin ground. ... That's nonsense, utter nonsense." R. 953-54.
An article appeared in The Birmingham News concerning Miss Arrington's arrest and the missing documents on July 6. The contents of that article were not made available to the jury.
July 9: Secretary Evers typed a memorandum from the Chief Deutcsh addressed to "All Members of the Department." In part, that memorandum stated:

*1233 "Although this arrest was alleged to have emanated from a riot situation, and in spite of the fact that a VIP's family was involved, I or my office was never notified. It was not until approximately 12 hours later, as a result of a call from the Mayor's office requesting information concerning the matter that we became aware of it. As a result of that call, all standard and proper procedures were utilized to apprise your Chief and Mayor of what had transpired, and also to investigate a civilian complaint which had been lodged....
"All reports in relation to this incident were and are in place. They are in order and nothing has been rewritten or deleted. It is not true (as stated [in the newspaper] on July 7, 1990) that this department only agreed to make a `missing page' available after we were contacted by a lawyer from the newspaper. We have not heard of anyone in this department being contacted by the paper's attorney and have made no `deals' with anyone. As stated previously this incident was handled routinely...." R.2020-21 (emphasis in original).
July 16, 1990: Sergeant Terry Loggins, Internal Affairs Division of the Birmingham Police Department, was assigned by Deputy Chief Newfield and Deputy Chief Miller to investigate the jail records. His immediate superior was Captain R.L. Webb who was in Chicago on this particular date. Loggins interviewed Owens, Stone, Howell, Lee, Woodrick, Blackwell, Mead, Alexander, the Browns, and Adley. He had the interrogations transcribed and gave them to Cpt. Webb who had returned on July 5. Loggins did not prepare a report summarizing his findings in this case and was not aware of any internal police regulation that required such.
Capt. Webb testified that he gave the tape recordings of the interviews, the transcripts, and the whole file of Loggins' investigation to Deutcsh on this date. Webb testified that the rules and regulations of the police department require that summary report findings be made, but that they were not made in this case. There was no direction given not to make a report and, Deutcsh wanted the file as soon as possible. One of the reasons why a report was never made because a lawsuit was filed and the attorneys got involved.
Adley testified that sometime after she had been interviewed by IAD, she observed Officer Rebecca Dill take some file folders, apparently containing typed transcripts of internal affairs interviews, from the Chief's office and make copies of the typed transcripts. Later, Adley discovered some copies in a garbage can in the room where the copies had been made. Among the copies was a copy of Adley's statement to internal affairs on July 19, 1990. Portions of that statement appeared to have been blacked out.
October 4, 1990:
Chief Deutcsh made his statement to the investigators of the Alabama Bureau of Investigations who were investigating the allegations concerning missing information from the jail records.
November 13, 1990:
Deutcsh's deposition was taken in the civil case of Bahakel v. City of Birmingham, which had been filed in federal court.[14] In the portion of that deposition that was admitted into evidence, Deutcsh testified that he had never seen a jail docket sheet, that he absolutely had not asked anybody to rewrite a docket sheet omitting Miss Arrington's name, that such a thing never happened, and that if a reporter says it did, "people see flying saucers also." R. 1151. In that deposition, Deutcsh testified that "[n]o records are missing or ever have been missing," R. 1152, that he told Howell and Lee to gather "[e]verything. Everything that was necessary and I wanted an in-depth report, I wanted that they should leave no stone unturned. I had to find out *1234 all because the Mayor, the Mayor wanted to know about this." R. 1155.
At trial, Cpt. Blass admitted that it would be a "practical impossibility" to make all the evidence of Miss Arrington's arrest disappear, R. 636, and that Deutcsh had the authority to retrieve and look at any of the records involved R. 605.

VI.
We find that based on the evidence presented at trial, the question of Deutcsh's guilt or innocence was properly submitted to the jury. "The weight of the evidence, the credibility of the witnesses, and inferences to be drawn from the evidence, where susceptible of more than one rational conclusion, are for the jury alone." Willcutt v. State, 284 Ala. 547, 549, 226 So.2d 328, 330 (1969).
"The trial judge must determine initially whether there is prima facie evidence that a conspiracy exists. Once he so determines the existence of such a conspiracy becomes a question for the jury." Williams v. State, 383 So.2d 547, 555 (Ala.Cr.App.1979), affirmed, 383 So.2d 564 (Ala.), cert. denied, 449 U.S. 995, 101 S.Ct. 534, 66 L.Ed.2d 293 (1980). "Agreements to enter into conspiracies can be shown by inferences from the conduct of the participants. United States v. Elledge, 723 F.2d 864, 865 (11th Cir. 1984). In addition, it need not be shown that the defendant knew all of the details of the alleged conspiracy as knowledge of the essential objective is sufficient to impose liability." United States v. Johnson, 889 F.2d 1032, 1035 (11th Cir.1989). "Although association alone will not support an inference of conspiracy, association with co-conspirators may be considered as a factor." United States v. Cannington, 729 F.2d 702, 709 (11th Cir.1984).
Deutcsh stands convicted of Count One of the indictment. See Part I of this opinion. Count one charged that he "knowingly made a false entry in or falsely altered a governmental record, to-wit: records of the Birmingham City Jail and Police Department in violation of Section 13A-10-12(1)." R. 1802.
Of the five "governmental records" involved in this case, the State's evidence shows that the fingerprint card and the photograph were neither altered nor destroyed, although they were removed from their proper location for a period of time. Although the original docket sheet was not altered except to the extent that it was folded and creased, a second "altered" docket sheet was temporarily substituted in its place. The M.I.A.R. computer data base reference file was deleted in the morning but replaced that same afternoon. Information on a copy of the fingerprint log was lined through and whited-out during the morning but replaced that afternoon.
In reviewing a conviction based on circumstantial evidence, there are certain principles that an appellate court must follow. Those principles have been collected in Cumbo v. State, 368 So.2d 871, 874-75 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979), White v. State, 546 So.2d 1014, 1016-18 (Ala.Cr.App.1989), and Cox v. State, 585 So.2d 182, 203-05 (Ala.Cr. App.1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1676, 118 L.Ed.2d 394 (1992). See also Johnson v. State, 555 So.2d 818, 819-20 (Ala.Cr.App.1989) distinguishing the "weight" from the "sufficiency" of the evidence. The most basic principles of review can be summarized as follows: 1) In determining the sufficiency of the evidence to support a conviction, the test is whether the jury, not this court, might reasonably find that the evidence excluded every reasonable hypothesis but that of guilt. In other words, does there exist any reasonable theory from which the jury might have concluded that the defendant was guilty of the crime charged? 2) The appellate court, in applying that test, must accept the evidence presented by the prosecution as true, must indulge all legitimate inferences in favor of the prosecution, and must consider the evidence in the light most favorable to the prosecution. 3) An appellate court may not reweigh the evidence presented at trial or substitute its judgment for that of the jury, except in those extreme situations when it determines that the verdict of the jury is wrong and unjust.
*1235 Applying these principles to the facts contained in the record in this case, this Court finds the evidence sufficient to support Deutcsh's conviction. We emphasize that the question of guilt was strictly one for the jury. The legal sufficiency of that evidence is not so lacking as to convince this Court that the jury was wrong.

VII.
Deutcsh contends that the admission into evidence of testimony he gave in a deposition in a civil case constituted inadmissible hearsay and resulted in reversible error.
At trial, the prosecution was allowed to introduce into evidence, over objection, a portion of the sworn testimony Deutcsh had given in his deposition in a civil case in federal court[15] on November 13, 1990. The trial judge permitted this testimony because "knowledge" was an essential element of the offense charged in the indictment. R. 1142.
Deutcsh's statements were admissible as an exception to the hearsay rule. Kuenzel v. State, 577 So.2d 474, 512 (Ala.Cr.App. 1990), affirmed, 577 So.2d 531 (Ala.), cert. denied, ___ U.S. ___, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). "The rule is that the acts, declarations, and demeanor of an accused, before or after an offense, whether a part of the res gestae or not, are admissible against him, but, unless a part of the res gestae, are not admissible for him." Shadle v. State, 280 Ala. 379, 384, 194 So.2d 538, 542 (1967); Atchley v. State, 393 So.2d 1034, 1050-51 (Ala.Cr.App.1981). See also Edwards v. State, 34 Ala.App. 373, 375, 40 So.2d 103, 104 (1949) (in prosecution for bigamy, defendant's statements in equity case admissible as admissions or declarations against interest). "Inculpatory statements voluntarily made by defendant are admissible against him," even where those statements appear in a transcript of the defendant's trial testimony against his codefendant. Green v. State, 24 Ala.App. 235, 236, 133 So. 739 (1931). See also Coplon v. State, 15 Ala.App. 331, 337, 73 So. 225, 228 (1916), cert. denied, 199 Ala. 698, 74 So. 1005 (1917) (defendant's testimony before grand jury as a witness against another admissible against defendant).
We decline to address the other issues raised on this appeal because we find that they are without merit or because they are not likely to recur in the event of further proceedings in the circuit court.
The judgment of the circuit court is reversed for the reasons stated in Part II of this opinion. This cause is remanded to the trial court for further proceedings not inconsistent with this opinion.
REVERSED AND REMANDED.
PATTERSON, P.J., and TAYLOR and McMILLAN, JJ., concur.
MONTIEL, J., dissents with opinion.
MONTIEL, Judge, dissenting.
In Part II of the majority opinion, the majority concludes that this "conviction must be reversed because the trial judge failed to respond to the confusion expressed by the jury over the question of Deutcsh's legal and criminal liability for the actions of others." I disagree.
After the jury had been deliberating for approximately two hours, the jury returned to the courtroom and the following occurred:
"[FOREMAN]: I don't know what I can ask, or what, because there's been so much statement as to who can say what and how you say it, and everything.
"One of the questions that has arisen is didthere's a point heredid the defendant actually order these things to be done, orI'm having a real problem with the verbiage here as to how to getor did the actions of people under his command, if that was the case ... somebody in the jury said that they heard that through other people's actions the Chief could be held accountable and found guilty of these charges.
*1236 "That's where we're having a problem. Is that the case?
"THE COURT: Well, here again, I have to rely on your individual recollections. I want you to rely on your individual recollections as to what the evidence was.
"I do not intend, nor can I, comment on any portion of the evidence, and as to what the evidence was, I'm repeating myself, I have to leave it up to your individual recollections.
"That's one reason, now, when you get to another point in your question, in reading the charges, verbatim, from the statute, I have to rely on your individual recollections as to what the Court charged you in its entire charge.
"Does that
"[FOREMAN]: Now, that was your entire statement from
"THE COURT: from the very beginning.
"[FOREMAN]: from the very beginning.
"THE COURT: From the time I read the indictment and the more specific statement to you, all the way through.
"[FOREMAN]: Would you, for clarification... do that again?
"THE COURT: Will you gentlemen approach the bench, please. (Bench conference held, out of hearing of court reporter.)
"THE COURT: Ladies and gentlemen, I'll have to rely upon your individual recollections as to what the Court charged you.
"Now, each one of you can discuss with the others everything that wasas far as the evidence was concerned or as far as the law was concerned, [what] the Court has charged you on. It doesn't have to be just one person. In fact, each one of you are separate individuals, and entitled to your own opinion.
"You may retire for further deliberations."
(R. 1428-32.) The jury then resumed its deliberations for 12 minutes before going to lunch. The jury's verdict was delivered eight minutes after it returned from lunch. It appears from the supplemental record that defense counsel objected to the trial court's failure to give additional instructions that were requested by the jury foreman but that counsel's objection was not recorded by the court reporter. Almost one year after the trial, a hearing was held to supplement the record to include defense counsel's objections and the trial court's ruling on his objection. At this hearing, the following occurred:
"[MR. BOWEN (defense counsel):] We also at that time objected to the court's oral charge regarding aiding and abetting and complicity.
"....
"And we objected concerning his oral charge on conspiracy and complicity in that it was confusing.
"....
"After the jury began deliberating, they came out with a question and told the Court that they were having a hard time discerning the difference between count one and count two. And we all agreed at that time that the court could reread the statute, [13A-10-12(a)(1) and (2)] that was charged in the two counts.
"Judge Jasper did that, he read the statute to them verbatim again. And I am not sure if at that point or a later point, but at one point after that they came back and said, `that really doesn't help us, we have got a problem in that somebody here on the jury, or some of the jurors are saying that the defendant can be convicted because the people [who] did do something worked for him,' or words to that effect.
"Judge Jasper calls us to the bench and said, `If y'all want me to, I will reread the wholeregive my complete oral charge.' And as I recall, Mr. Brown this is not on the record eitheranother one of those instances where the court reporter says outside of her presence and hearing.
"MR. WHITE: Page 1431 of the transcript.
"MR. BOWEN: Mr. Brown says that that's okay with the State to reread the whole charge. And we objected to it and told the Judge that they were apparently *1237 having a problem withwhat they perceived to be the vicarious liability on the part of the defendant and that that needs to be cleared up. But we objected to just giving the whole oral charge.
"THE COURT: Yes.
"MR. BOWEN: And the Judge elected not to do anything. He just told them to rely on their recollection of the charge and go back and deliberate.
"And after that, they got a verdict in about fifteen or twenty minutes, to the best of my recollection."
S.R. 7-11.
Rule 22.2, A.R.Crim.P. states:
"After the jurors have retired to consider their verdict, if they request to have any testimony repeated, or if they or any party requests additional instructions, the court may recall the jurors to the courtroom and order the testimony read or give appropriate additional instructions. The court may also order other testimony read or give other instructions, so as not to give undue prominence to the particular testimony or instructions requested. Such testimony may be read or such instruction given only after notice to the parties."
As Judge Patterson noted in Jackson v. State, 581 So.2d 553, 559 (Ala.Crim.App. 1991), "[Rule 22.2] ... is permissive rather than mandatory as evidenced by the use of the word `may.'" Therefore, the trial judge, in his discretion, should decide when additional instructions are necessary.
The following portion of the record contains the trial court's instruction on Deutcsh's criminal liability for the conduct of others:
"And, ladies and gentlemen, it is my duty to charge you on the law of complicity in the State of Alabama.
"A person is legally accountable for the behavior of another, or others constituting a criminal offense, if, with the intent to promote or assist in the commission of the offense, he aids or abets such other person or persons in committing the offense.
"It is not necessary to prove complicity by positive evidence, but the existence of the complicity may be inferred from the attendant circumstances of the act. All persons concerned in the commission of a misdemeanor, whether they directly commit the act constituting the offense, or aid and abet in its commission, must be punished as principals.
"In order to hold that an individual is an accomplice, it is necessary that the State prove beyond a reasonable doubt and to a moral certainty that he aided and abetted in the offense. This comprehends all assistance rendered by act or words of encouragement or support or presence, actual or constructive, to render assistance should it become necessary.
"The key elements of accomplice liability are encouragement or presence with a view to render aid should it become necessary. When liability is predicated on the latter, it is essential that the principal be aware of the accomplice's support and willingness to lend assistance.
"And that, very simply, is what the law of complicity in the State of Alabama is."

____
"Thirteen. I charge you, ladies and gentlemen of the jury, that a person is legally accountable for the behavior of another person constituting a criminal offense if, with the intent to promote or assist in the commission of the offense, one, he procures, induces, or causes such other person or persons to commit the offense. Or, two, he aids and abets such other person in committing the offense. All persons concerned in the commission of an offense, whether they directly commit the act constituting the offense, or aid and abet in its commission, as I will define that term `aid and abet' to you, are considered principals.
"Before the defendant can be held criminally responsible for the act of others, it is necessary that the defendant intentionally associated himself in some way with the criminal venture, and intentionally participated in it as he would in something he wishes to bring about, that is to say, that the defendant intentionally *1238 seeks by some act to make the criminal venture succeed.
"Of course, mere presence at the scene of a crime, or knowledge that a crime has been committed, is not sufficient to establish that a defendant either directed or aided and abetted the crime, unless you find beyond all reasonable doubt that the defendant was a participant, and not merely a spectator.
"In other words, you may not find this defendant guilty unless you find beyond a reasonable doubt that every single element of the offense as defined in these instructions was committed by some person or persons, and that this defendant intentionally participated in the commission of that offense.
"I further charge you that the relationships and association between parties which are natural and reasonable in the ordinary events and circumstances of everyday affairs do not constitute evidence of complicity."

____
"Fifteen. I charge you, members of the jury, that if you are convinced beyond a reasonable doubt from the evidence that someone did unlawfully change, alter, or delete some governmental record as charged in this indictment, you cannot convict this defendant unless you are also convinced beyond a reasonable doubt by the evidence that this defendant knowingly and intentionally aided and abetted the commission of such an offense, as I have defined that term for you."
(R.1406-08, R. 1414-16)
Here, the trial judge in his oral charge thoroughly instructed the jury on the subject of a person's criminal liability based on the actions of others. He also gave a requested charge on this matter. Further, the trial court offered to report his entire charge to the jury but defense counsel chose not to pursue this remedy. Instead, defense counsel objected to the offer of the trial judge, and the trial judge chose not to give any additional instructions. The trial judge must have felt that reinstructing the jury on the complicity part of the charge alone would give "undue prominence" to that portion of the instructions. Jackson. After the trial judge told the jurors to rely on their recollection of the jury charge, the jurors did not ask for any further clarification. I do not believe the trial judge erred by refusing to reinstruct the jury on complicity and by telling the jurors to "rely on the their recollection of the charge." Jackson. Therefore, I respectfully dissent.
NOTES
[1] The appellant was not charged with a violation of subsection (a)(3) of § 13A-10-12 which provides:

"(3) Knowing he lacks the authority to retain a governmental record he refuses to deliver up the record in his possession upon proper request of a person lawfully entitled to receive such record for examination or other purposes."
[2] "Upon the appellant's demand ... the State was required to inform appellant of the precise facts in the documents that it alleged were false entries.... To afford a defendant sufficient notice of an offense [of tampering with governmental records], the charging instrument should allege the essential elements of the offense and identify the false entry." Cook v. State, 824 S.W.2d 334, 338 (Tex.App.1992). See also Dutton v. State, 25 Ala.App. 472, 474, 148 So. 876, 878 (1933) ("The indictment in this case charges just that, [i.e., that the record was altered, injured, mutilated, or destroyed,] identifies the exact spot on the record, and specifies the change made. The indictment is sufficient as against the demurrer."), overruled on other grounds, Wilson v. State, 371 So.2d 932 (Ala.Cr. App.1978).
[3] We recognize that an argument could be made that this issue was preserved for review when the appellant requested a mistrial based on the verdicts of the jury. In Ex parte Marek, 556 So.2d 375, 379 (Ala.1989), the Alabama Supreme Court stated that "a litigant who requests such drastic relief as a mistrial implicitly requests lesser relief that is proper, in case the greater relief is denied or is found to be improper." We need not address that argument in this case because a reversal is required on other grounds.
[4] This was the third time the trial judge had read the statute to the jury. At the beginning of his oral instructions, the trial judge read the indictment to the jury. R. 1396. During his charge, he initially read the statute to the jury. R. 1408. The trial judge read the statute to the jury in response to the jury's first and second questions after deliberations had begun. R. 1423, 1426. We note that after the third reading of the statute, the foreman replied, "That still doesn't answer." R. 1427.
[5] The circuit judge who heard and ruled on the motion for new trial was not the trial judge.
[6] "Meddle" is not an element of Alabama's "tampering" offense. It has been defined generally and in other contexts to mean: "to involve oneself in a matter without right or invitation; interfere officiously and unwantedly." The Random House Dictionary of the English Language 1193 (2d ed. 1987). "Among the definitions there given [Webster's International Dictionary] of `tamper' are found `to meddle so as to alter a thing; especially to make corrupting or perverting changes; as, to tamper with a document or a text; to interfere improperly.' Again, another use is `to meddle; to busy oneself rashly; to try trifling or foolish experiments.'" United States v. Tomicich, 41 F.Supp. 33, 35 (E.D.Penn.1941), affirmed, 126 F.2d 1023 (3d Cir.1942) (prosecution for violation of statute making it unlawful for any person to tamper with motive power or instrumentalities of navigation of certain vessels). "The term `tamper,' when used in a criminal statute `has the limited meaning of improper interference "as for the purpose of alteration, and to make objectionable or unauthorized changes."' Keefe v. Donnell, 92 Me. 151, 42 A. 345, 348 (1898)." State v. Harlston, 565 S.W.2d 773, 778 (Mo.App. 1978).
[7] Section 241.8(1)(c) of the Model Penal Code provides:

"(1) A person commits an offense [of tampering with public records or information] if he:
"....
"(c) purposefully and unlawfully destroys, conceals, removes or otherwise impairs the verity or availability of any such record, document or thing."
The comment to that section states:
"Another aspect of the specification of prohibited conduct that deserves mention is the application of the verb `removes' to temporary withdrawal of documents from their usual repository for purposes of photocopying and the like. While such conduct might constitute a literal removal, it does not satisfy the statutory requirement of removal of a sort that impairs the verity or availability of the document or record. Even if the photocopying leads to disclosure that lessens the utility to the government of the information contained in the record, a brief removal from the files does not impair the verity or availability of the document itself. Thus, such conduct would not be covered under Paragraph (c). That is not to say, however, that such action is exempt from liability under the Model Code. Photocopying confidential documents may amount to theft of information and should be punished as such, if at all. This analysis accords with a realistic assessment of the kind of wrong accomplished by unauthorized removal and inspection of confidential documents. If the record is returned promptly to its assigned repository, its availability to the government is not impaired. In such a case, the removal itself is de minimis. What may be important is the loss of the information contained therein. The law of theft addresses that harm directly."
Model Penal Code § 241.8 at 191 (1980) (emphasis added) (footnote omitted).
[8] "In a prosecution under this statute the question is not the materiality of the change, but, was the record altered, injured, mutilated, or destroyed either in whole or in part intentionally, fraudulently, or maliciously? The point is that the statute is aimed at the preservation of the record as a monument of what has been done." Dutton, 25 Ala.App. at 474, 148 So. at 878.
[9] On August 5, 1991, Lee was acquitted of the same charges made against Chief Deutcsh. R. 1995.
[10] In September 1991, Howell's trial for these offenses resulted in a mistrial due to a hung jury, with ten jurors voting for an acquittal. R. 1461. In December 1991, Howell was retried and convicted of tampering with governmental records and subsequently sentenced to 240 hours of community service. That conviction is presently pending on direct appeal before this Court. Howell v. State, 91-719.
[11] Stone was also acquitted of these charges.
[12] The time of the arrest noted on the arrest report completed by the arresting officer is 11:18 p.m. R. 2155. The testimony at trial indicates that the time of arrest on the docket book is 1:03 a.m. on July 5, 1990. R. 511.
[13] Miss Arrington was subsequently found not guilty of all charges in municipal court. R. 324.
[14] In the civil suit Bahakel v. City of Birmingham, Richard Arrington, Arthur Deutcsh, et al., CV90-PT-1834-S, Officer Bahakel alleged that he was wrongfully terminated from the Birmingham Police Department. In March 1992, summary judgment was entered in favor of the defendants.
[15] Bahakel v. City of Birmingham, Richard Arrington, Arthur Deutcsh et al., CV 90-PT-1834-S, United States District Court, Northern District of Alabama. R. 1124, 2039-50.