On the morning of January 24, 1977, the bodies of Jesse and Irene Doughty were discovered in their home. Both victims had died as a result of gunshot wounds. On November 18, 1985, the appellant was indicted in a three-count indictment on three charges of capital murder. Count I charged murder wherein two or more persons are killed, § 13-11-2(a)(10), Code of Alabama 1975 (repealed); count II charged murder committed during the course of a robbery, § 13-11-2(a)(2), Code of Alabama 1975 (repealed); and count III charged murder done for pecuniary gain or other valuable consideration, § 13-11-2(a)(7), Code of Alabama 1975 (repealed)[1] In 1986, the appellant was tried and convicted, and was sentenced to death. On March 17, 1989, this court affirmed the appellant's conviction and sentence inFrazier v. State, 562 So.2d 543 (Ala.Crim.App. 1989). On November 17, 1989, the Alabama Supreme Court held that a key witness for the State had perjured himself at the appellant's trial and that court reversed this court's judgment and remanded the cause for a new trial. 562 So.2d 560. In June 1990, the appellant was again tried for capital murder and was found guilty of all three counts. The trial court sentenced the appellant to death. He appeals from that conviction and sentence.
Thomas Edward Doughty testified that he found his parents on the kitchen floor of their home in Mobile on the morning of January 24, 1977. Doughty testified that his father usually carried between $5,000 and $6,000 cash on his person and that he kept approximately $28,000 in a sofa which had a false bottom. He said that his father also had an extensive gun collection and that one of the guns had a gold trigger. Doughty testified that on the morning he found his father, there was no money on his father's person or in the sofa. Doughty further testified that at the time of his death, his father was vice-president of Campbell Construction Company and that Lee Jackson was in charge of the shop and the rental contracts for that business.
Diane Frazier testified that in January 1977, she was dating the appellant. The two began living together sometime in February or March 1977. Frazier later became the appellant's common law wife. She testified *Page 1004 
that sometime in early January 1977, the appellant asked her "about doing something, and for a large amount of money." She said she told him it was his decision and he could do what he wanted. She testified that on the Saturday before the bodies were found on Monday, she and the appellant were at Dickie and Marilyn King's house. She said that the appellant and Dickie King left the house that night and that when they returned several hours later, the appellant stated, "It's over." She testified that over the next several days, the appellant told her about the murders in a series of conversations. She said that the appellant told her that King had approached him about killing someone for Lee Jackson. Frazier said that the appellant got $5,000, Grady Lambert got $5,000, and King got $2,500 for the murders. Frazier testified that he and Lambert gained access to the Doughtys' house when Lee Jackson called the Doughtys and told them that he was having some deer meat delivered. Frazier described some of the items in the house that the appellant had told her about. She said that the day after the murder, the appellant told her he needed to get rid of the gun, so she threw it into the Dog River. According to Frazier, the appellant had lots of money right after the murder and the two spent the money on heroin — the appellant would buy $400 or $500 worth of heroin a day from Charles Turner. Frazier said that between 1977 and August 1985, the appellant got thousands of dollars from Lee Jackson. Jackson continued to give Diane Frazier money until October of 1985.
Dr. Marion Sennett, a criminalist with the Alabama Department of Forensic Sciences, testified that both victims were killed with bullets fired from the same gun. These bullets could have been fired from a .357 Colt Trooper. James Jackson, Lee Jackson's son, testified that he sold Dickie King a .357 Colt Trooper in September 1976.
Charles Turner, the appellant's cousin, testified that on the day after the murders, the appellant bought approximately $300 to $400 worth of heroin from him, which the appellant paid for with $100 bills. He said that the next day, the appellant showed him a plastic sandwich bag full of $100 bills. He said that the next week, he and Turner went to the Mobile County Work Release Center to deliver some drugs to Grady Lambert. He said that the appellant paid for these drugs in $100 bills and that the appellant bought heroin from him frequently during this time.
Dalton Henry Sheffield, Jr., testified that he, the appellant, and Grady Lambert had been lifelong friends. Sheffield said that in February 1977, he was selling drugs and that he called the appellant and asked him if he wanted to buy some drugs. According to Sheffield, the appellant told him that he did not want any but that Lambert might want some. Sheffield said he then went to the work release center and sold Lambert drugs. Sheffield said that he asked Lambert where he got the money for the drugs and that Lambert told him about the murders. Sheffield testified that in March or April 1977, the appellant stopped at Lambert's father's house; he was driving a dune buggy. Sheffield said that he asked the appellant where he had gotten the money to purchase the dune buggy and that the appellant said that he and Lambert had made a "good score." The dune buggy the appellant was driving was similar to a dune buggy that Jackson obtained from the Doughtys' children shortly after their parents' deaths.
Sheffield said that he told the appellant that day that Lambert had told him about the Doughtys and that the appellant looked surprised and then told Sheffield that he and Lambert were "big time hit men." Sheffield said that the appellant told him that Lee Jackson had paid them to murder the Doughtys because Jesse Doughty had "hurt" Jackson in some kind of construction contract. According to Sheffield, when he asked the appellant why he killed Irene Doughty, he replied that she just happened to be in the house at the time.
Richard Johnson also testified that he grew up with the appellant and Lambert. He testified that in January 1977, he was living at the work release center in Mobile and that Grady Lambert was living there at the time. Johnson said that the appellant came to the center and asked Lambert if he wanted to "do a job" with him. He said that *Page 1005 
the appellant told him that a contractor had told him that another contractor would not pay him and that the first contractor told the appellant where he could get some money on Highway 90 and there would be more money available. That night, according to Johnson, Lambert left the center and did not return for several hours. He said that later, the appellant came to the center and asked Lambert if he wanted some heroin and that Lambert gave the appellant a $100 bill. Johnson said that before he left the center that night Lambert did not have any money. Johnson testified that later that night, Lambert told him about the Doughty murders.
Johnson testified that the next day, the appellant brought Lambert some more heroin, which Lambert paid for with another $100 bill. He said that on that day, he, the appellant, and Lambert talked about the murders. Johnson said that on this occasion the appellant told him that one of the guns in the Doughty house had a gold trigger. Johnson said that when Johnson asked the appellant why he killed the woman, the appellant said he was not going to the penitentiary for anybody and that when she started screaming, he shot her and that Lambert shot Mr. Doughty. Johnson testified that the appellant said he got $10,000 from the house and that he threw the gun in the river.
The appellant's defense consisted mainly of attacking the credibility of the State's witnesses. The appellant and Lambert denied participation in the murders.
 I
The appellant contends that the trial court erred in admitting the tape recording of a statement between Lee Jackson and Diane Frazier made in 1985 while Frazier was wired.
The State argues that the statement was admissible on two grounds. First, the State asserts that the statement was properly admitted as a prior consistent statement of Diane Frazier.
 "As a general rule, the impeachment of a witness by the introduction of evidence that he has made a statement which is inconsistent with his testimony does not authorize the proponent of the witness to support his credibility by evidence that the witness has made a statement on another occasion of the same tenor as his present testimony."
C. Gamble, McElroy's Alabama Evidence § 177.01(2) (4th Ed. 1991). However,
 "Impeachment of a witness by proof of his bias in favor of the party who called him or against the other party does not authorize the admittance of evidence in support of the witness' credibility that he previously made a statement of substantially the same tenor as his present testimony. However, if it is claimed that the witness' bias arose at a particular point of time, evidence that he, prior to such particular point of time, made a statement of substantially the same tenor as his present testimony is admissible. Stated differently, it is said that a witness charged with a motive or interest to misstate or misrepresent the facts concerning which he has testified, growing out of his relation to the cause or to the litigant in whose behalf he gave testimony, may be supported and corroborated by proof that he made statements consistent and in harmony with his testimony, before that relation existed."
C. Gamble, McElroy's Alabama Evidence § 177.01(4) (4th Ed. 1991).
The evidence shows that defense counsel questioned Frazier extensively about inconsistencies between her trial testimony and statements she gave to the police in March 1981 and January 1983 and her grand jury testimony in November 1985. The State argues that the appellant alleged at trial that Frazier became biased towards the State during the grand jury proceedings in 1985 and, that therefore, the tape-recorded conversation between Frazier and Jackson was properly admitted because the conversation took place before her testimony before the grand jury. The record, however, does not support the State's argument. The record shows the defense believed that Frazier became biased toward the State when she made her initial statement to the police in March 1981. At that time, Frazier was in jail on forgery charges. The day after she made her statement, she was released from jail and *Page 1006 
the charges against her were nol-prossed a week later. Therefore, because Frazier's bias arose before the taped conversation between Frazier and Jackson, this evidence should not have been admitted as a prior consistent statement.
Second, the State argues that the tape-recorded conversation was properly admitted as a statement in furtherance of a conspiracy. It is clear from the record that the trial court was initially concerned about the admission of the recording under this theory. After argument from both sides, the court stated:
 "THE COURT: I guess what troubles me is that I don't see any evidence that the Defendant was part of any conspiracy to suppress. And that's what is troubling me about that.
". . . .
 "THE COURT: Logic and common sense tells me, and I think it's admissible under certainly one of the two. I'm going to allow it."
(R. 717.)
 " 'In order for the extrajudicial statement of a coconspirator to qualify under the coconspirators' exception, three distinct conditions must be met. First, the statement must have been made in furtherance of the conspiracy. Second, the statement must have been made during the pendency of the conspiracy. Finally, . . . the existence of the conspiracy must be shown by independent evidence.' "
Deutcsh v. State, 610 So.2d 1212 (Ala.Cr.App. 1992) (quoting Annot., Necessity and Sufficiency of Independent Evidence ofConspiracy to Allow Admission of Extrajudicial Statements ofCoconspirators, 46 A.L.R.3d 1148 (1972)). While the first and second requirements may have been met, the third requirement was not.
 "The existence of the conspiracy must be proved by evidence which does not include the statements of the coconspirator and which may consist solely of circumstantial evidence.
 " 'This proof of the existence of the conspiracy must be independent of the statements of the defendant's co-conspirators. . . . The initial existence of a conspiracy may not be proved by the statement of the co conspirators.' Ingle v. State, 415 So.2d 1225, 1228-29 (Ala.Cr.App. 1982)."
Deutcsh. 610 So.2d at 1222. In this case, the only evidence of the existence of a conspiracy between Frazier, the appellant, and Lee Jackson came from Frazier's testimony. There was no independent evidence of any conspiracy between these three persons. Thus, the tape-recorded conversation was improperly admitted into evidence under the theory that it was a statement in furtherance of a conspiracy. The error caused by the improper admission of this evidence cannot be considered harmless because this evidence affected the credibility of the State's main witness.
Furthermore, even had the recording been admissible, the prosecutor improperly commented on the substance of the recorded conversation. Prior to closing arguments, defense counsel asked the trial court to charge the jury that it was to consider the conversation only for purposes of determining credibility and it was not to consider the substance of any statements made by Lee Jackson. The State agreed to such a charge and the trial court stated that it would charge the jury accordingly.
During the State's closing argument immediately after this discussion, the following occurred:
 "And you might ask yourself, if Lee Jackson did not pay for it, why did he say on that tape yesterday, 'You tell them you don't know a damn thing'?
". . . .
 "And then we get to the tapes. And the tapes were offered, ladies and gentlemen, to corroborate Diane Frazier's testimony. And they were further offered to show that, yes, Lee Jackson had something to do with all of this.
". . . .
 "It is in the transcript, and as Judge Kittrell said, you go by the transcript and you judge, again, based on your common sense whether or not Lee Jackson had something *Page 1007 
to do with this based upon the transcript which is in evidence."
(R. 1039-40, 1045, 1084.) Although defense counsel did not object to this line of argument, it was highly improper for the prosecutor to argue the substance of Lee Jackson's statements on the tape to the jury after the trial court had just stated that it would instruct the jury that the tape could be considered only as it affected Frazier's credibility.
 II
During the cross-examination of Grady Lambert, the following occurred:
 "Q. All right. Now, is it not a fact that you told Special Agent Jim Russell of the FBI on March 21, 19[86], that you used your true name until you received the newspaper article about the arrest and the conviction of Richard Frazier?
"A. No, sir, I don't think so.
". . . .
 "MR. SHIELDS: [defense counsel] May we approach the bench?
"THE COURT: Sure.
 "(A bench conference was had, during which the following occurred:)
 "MR. SHIELDS: Both of us were instructed not to refer to the result of either trial. They have now told the jury Richard was convicted. I would now —
"MR. GALANOS: [prosecutor] I didn't say —
 "MR. SHIELDS: You most surely did. He said, when you heard the newspaper —
 "THE COURT: We can go off record, I think I can have the reporter go back and find that. I'd rather do it at a recess. Unless there is something to be stipulated, let's take it up later.
"MR. SHIELDS: I just wanted to ask.
"THE COURT: I understand.
 "MR. GALANOS: He's right. I said it. I now recall saying it."
(R. 895-98). The appellant asserts that the prosecutor committed reversible error when he referred to the appellant's previous conviction for the offense for which he was being tried. We must agree. In Lloyd v. State, 53 Ala. App. 730, 733,304 So.2d 232, cert. denied, 293 Ala. 410, 304 So.2d 235
(1974), this court held that it is reversible error for the prosecution to comment on the result of a defendant's previous trial at a subsequent trial for the same offense. See alsoWyatt v. State, 419 So.2d 277, 282 (Ala.Crim.App. 1982). As the Fifth Circuit Court of Appeals stated in United States v.Attell, 655 F.2d 703, 705 (5th Cir. 1981), "[W]e are hard pressed to think of anything more damning to an accused than information that a jury had previously convicted him for the crime charged."
The State asserts that the error here was not preserved because the appellant failed to object when the question was asked. In this case, we find that the appellant's counsel properly preserved this issue by objecting when the prosecutor finished his cross-examination of the witness and by raising and arguing this issue in a motion for a new trial.
Even, however, had this issue not been preserved for our review, we would still review this alleged error under the plain error rule. Rule 45A, Ala.R.App.P. In Tomlin v. State,591 So.2d 550 (Ala.Crim.App. 1991), this court addressed a similar issue. In Tomlin, this court found reversible error when the State presented evidence that Tomlin's codefendant had been convicted of capital murder and had been sentenced to death. We determined that Tomlin had adequately preserved this issue for review, but we held that "[e]ven if no objection had been made to evidence of the codefendant's conviction, we would find plain error." Tomlin, 591 So.2d at 553. Certainly, if reference to the fact of a codefendant's conviction constitutes plain error, then reference to the defendant's prior conviction for the same offense for which he is being tried constitutes plain error.
The State argues in its brief that the prosecutor was not necessarily referring to the appellant's previous conviction for the offense for which he was being tried, but could have been referring to another conviction of the appellant. This argument is without merit because the prosecutor himself conceded that he was referring to the appellant's prior conviction for this offense. Further, it is well settled in Alabama that "evidence of any *Page 1008 
offense other than that specifically charged is prima facie inadmissible. Nicks v. State, 521 So.2d 1018 (Ala.Crim.App. 1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied,487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988)." Graves v. State,609 So.2d 456 (Ala.Crim.App. 1992). C. Gamble, McElroy'sAlabama Evidence, § 69.01 (4th ed. 1991).
The State also argues that even if the prosecutor's reference to the previous convictions was error, it was harmless because the appellant testified that he had been convicted once before of this offense and had been sentenced to death. However, the appellant contends that he would not have so testified if the prosecutor had not referred to his previous conviction.
In Jones v. State, 572 So.2d 1305 (Ala.Crim.App. 1990), this court stated that the test is not whether the appellant was, in fact, compelled to testify due to the admission of illegal evidence but whether there is a reasonable probability that the evidence complained of might have persuaded the appellant to testify and to testify to the same facts that were previously wrongfully admitted. "The state bears the burden of showing there was no causal connection" between the admission of the illegal evidence and the appellant's subsequent testimony. Jones, 572 So.2d at 1308. The State did not meet its burden in this instance. At the hearing on the motion for a new trial, defense counsel stated:
 "As far as Richard Frazier is concerned, we were wavering between whether he would testify or he would not testify. After it was announced to the jury that he had been convicted of capital murder, our decision was that he would then testify in order to rebut that and present himself to the jury in a more positive manner. Because of that, we feel like he did not get a fair trial."
Because the record evidences a reasonable probability that the appellant may not have testified had the prosecutor not made the improper reference to the appellant's earlier conviction for this offense, the State did not meet its burden of proving that this error did not injuriously affect the substantial rights of the appellant. Rule 45A, A.R.App.P.Jones. While we believe the prosecutor's reference to the appellant's prior arrest and conviction for this offense was inadvertent, the remark was so prejudicial as to constitute reversible error.
 III
During the cross-examination of one of the appellant's witnesses, the following occurred:
 "Q. [THE PROSECUTOR:] Sir, in 1981 you were convicted of murder and a robbery of Gail Nix, a thirty-eight-year-old —
"MR. SHIELDS: Judge, I'm going to object.
"MR. JORDAN:
"Q. — woman.
"THE COURT: Well, sustained.
"A. That is correct. I was convicted of that.
 "MR. SHIELDS: I'm objecting and he has sustained me.
 "MR. GALANOS: Excuse me. May I say something and I think I can say it calmer. The man has testified that he had morals and principles and could not live with himself if he lied. I think, based on that response, we are allowed to go into the fact that he murdered a woman.
"THE COURT: I sustain the objection."
(R. 820-21.) Later on recross-examination, the following occurred:
 "Q. [THE PROSECUTOR]: Okay. You were convicted of murder, you were convicted of capital murder; were you not?
"A. Yes, sir.
 "Q. You were convicted of committing a murder in the course of a robbery; were you not?
"A. Yes, sir.
"Q. And you killed a lady by the name of Gail Nix?
"MR. SHIELDS: Judge, —
"A. I haven't —
"MR. SHIELDS: I'm objecting to it.
"A. — killed anyone.
 "MR. SHIELDS: They're going into the specifics of the crime. They would not let *Page 1009 
us ask anything about Dalton Sheffield's specifics.
"THE COURT: Sustained.
"MR. GALANOS:
 "Q. Did you say, sir, that you did not kill anyone?
 "A. What I'm saying, sir, is that I'm not going to go into any details about my case.
 "Q. I'm not asking you to go into the details of your case.
 "A. You most certainly are and I'm not going into it.
 "Q. I very simply asked you, sir, with all due respect: Did you or did you not kill Gail Nix?
 "MR. SHIELDS: Judge, I'm going to object to it. Again, he's already stated —
"THE COURT: Sustained."
(R. 825-26.)
 "The presence of a rule that one may cross-examine a witness as to his conviction of a crime involving moral turpitude naturally gives rise to the question of how many details of that crime may the impeaching party ask about and, if necessary, prove by his own witnesses. The law of Alabama, in keeping with the general rule in this country, is that one generally cannot go beyond the name of the crime, the time and place of conviction and the punishment. It would be impermissible to ask about or prove further details such as the name of the victim, whether the victim was adult or child and general aggravating circumstances."
C. Gamble, McElroy's Alabama Evidence § 145.01(11) (4th ed. 1991). Here, defense counsel's objections to the prosecutor's questions were sustained by the trial court, but the prosecutor pursued the same prejudicial line of questioning. We caution the prosecutor, on retrial, to be mindful of the rule stated above.
We have reviewed the numerous other issues raised by the appellant on appeal and conclude that they are either without merit, do not constitute error, or are unlikely to occur on retrial. The State's evidence was sufficient to sustain the jury's verdicts on all charges. However, because of the errors discussed above, the judgment must be reversed and the cause remanded for a new trial.
REVERSED AND REMANDED.
All the Judges concur.
[1] This repealed statute and the pertinent subsections were replaced by § 13A-5-40(a)(10), (2), and (7), Code of Alabama 1975, respectively.