776 So.2d 884 (1998)
Jerry HAMMOND
v.
STATE.
CR-96-0273.
Court of Criminal Appeals of Alabama.
August 28, 1998.
Opinion Modified on Denial of Rehearing November 20, 1998.
*885 Blake A. Green, Dothan; and Deanna S. Higginbotham, Dothan, for appellant.
Bill Pryor, atty. gen., and Rosa Davis and Michelle Riley Stephens, asst. attys. gen., for appellee.
COBB, Judge.
Jerry Hammond appeals from his conviction for capital murder, a violation of § 13A-5-40(a)(2). On September 16, 1996, Hammond was tried, for the second time,[1] before a jury on the charge that he murdered his uncle, James McNeil, during the commission of a robbery in the first degree. Following the guilty verdict, the jury recommended, by a vote of 11-1, that Hammond be sentenced to death. The trial court imposed the death sentence recommended by the jury. Hammond appeals.
The State's evidence tends to show the following. On August 3, 1988, Jerry Hammond and Sandra Jackson went to Hammond's house in Dothan, where they smoked crack cocaine. During the late evening hours, they smoked crack cocaine on four occasions. Between those occasions they drove back and forth from Hammond's house to Martin Homes housing project, where they would purchase more crack cocaine. According to Jackson, they would smoke the crack cocaine at Hammond's house, and after the effects of the drug wore off after 10 to 20 minutes, they would go purchase some more crack cocaine. After the fourth purchase, the two had run out of money and, according to Jackson, Hammond told her he could get some money "from a lady that he knew." Sometime after midnight, the two left Hammond's house in a distinctive blue *886 Volkswagen automobile with "mag wheels" and a "T-top" roof. They drove to the Dothan neighborhood where Hammond's 80-year-old uncle James McNeil lived. According to Jackson, Hammond got out of the car carrying a yellow towel and a knife. He told her, "I'm not going to Cousin McNeil's house." She stayed in the car, and watched Hammond walk down the street into the dark. Jackson testified that, as she sat in the car, she heard a door "pushing, as if something was hindering it from opening." She said she also heard loud groaning, and the sound of glass breaking. When Hammond returned to the car, he did not have the towel, but he was still carrying the knife. He was also carrying a pair of blue pants that had what appeared to Jackson to be wet blood on them. According to Jackson, Hammond told her to "shut up" when she asked what he had done. As he drove, Hammond removed his shirt and threw it out the window. He went through the blue pants and retrieved a wallet from which he removed money. The wallet and pants were also thrown out the car window. Hammond and Jackson parked the car on a dirt road and left, going in different directions.
During this time, Robert Ealy, James McNeil's next-door neighbor, was home visiting with his cousin. According to Ealy, he heard "some rattling and a bunch of noise" coming from McNeil's house. He could hear James McNeil "hollering." As he and his cousin stood on his porch, Ealy heard the "sound of a window breaking" and he saw Hammond leave James McNeil's home through a window and jump into some bushes. Ealy said Hammond was carrying something. Ealy testified that his cousin asked Hammond what was going on in the McNeil home, but Hammond did not respond. They watched Hammond walk back down the street and get into the blue Volkswagen with "mag wheels" and drive off.
When police and paramedics arrived at McNeil's home, they found James McNeil lying on the kitchen floor in a pool of blood, with a refrigerator lying on top of him. He was dead. McNeil's roommate, an elderly man named Eddie McKissick, was in another room, suffering from a stab wound to his back. James McNeil had died from multiple stab wounds, including a stab wound to the chest that pierced his heart.

I.
Hammond argues that the trial court erred in failing to instruct the jury on voluntary intoxication. The record indicates that the trial court declined to give instructions requested by the defense on voluntary intoxication or on any lesser included offenses to capital murder. According to State witness Sandra Jackson, she and Hammond had smoked crack cocaine four times on the night of the murder, beginning at about 9:30 p.m. and continuing up to the time she and Hammond left his house to find more money. On each occasion, they would smoke all the crack cocaine they had purchased and then go back to their supplier and buy more. After buying more crack cocaine, she and Hammond would return to Hammond's house, where they would smoke it all again. The prosecutor also asked Ms. Jackson, "Did you use any marijuana that night?"; she responded, "Yes." (R. 756.) On cross-examination, Sandra Jackson testified that she believed she and Hammond had smoked two pieces of crack cocaine the first time, two or three pieces the third time, and one piece of crack cocaine the fourth time. She could not remember how much crack cocaine they had bought and smoked on the second occasion. She admitted the crack cocaine made her "high." (R. 808-15.) The State's theory of the case was that Hammond killed James McNeil while stealing money from him to "feed" his "cocaine habit." (R. 1818.)
This court has previously addressed the question of when an instruction on intoxication should be given. In Fletcher v. *887 State, 621 So.2d 1010 (Ala.Cr.App.1993), we held:
"A charge on intoxication should be given if `"there is an evidentiary foundation in the record sufficient for the jury to entertain a reasonable doubt"' on the element of intent. Coon v. State, 494 So.2d 184, 187 (Ala.Cr.App.1986)(quoting Government of the Virgin Islands v. Carmona, 422 F.2d 95, 99 n. 6 (3d Cir. 1970)). See also People v. Perry, 61 N.Y.2d 849, 473 N.Y.S.2d 966, 966-67, 462 N.E.2d 143, 143-44 (App.1984)(`[a] charge on intoxication should be given if there is sufficient evidence of intoxication in the record for a reasonable person to entertain a doubt as to the element of intent on that basis'). An accused is entitled to have the jury consider the issue of his intoxication where the evidence of intoxication is conflicting, Owen v. State, 611 So.2d 1126, 1128 (Ala.Cr.App.1992); Crosslin v. State, 446 So.2d 675, 682 (Ala.Cr.App.1983), where the defendant denies the commission of the crime, Coon v. State, 494 So.2d at 187; see Moran v. State, 34 Ala.App. 238, 240, 39 So.2d 419, 421, cert. denied, 252 Ala. 60, 39 So.2d 421 (1949), and where the evidence of intoxication is offered by the State, see Owen v. State, 611 So.2d at 1127-28.
"... In reversing two separate capital convictions where the trial court refused to instruct the jury on the lesser included offense of manslaughter, this Court has stated:
"`No matter how strongly the facts may suggest that appellant was not so intoxicated at the time he committed the offense that he was incapable of forming the necessary specific intent, the jury should have been instructed on manslaughter as a lesser included offense since there was a "reasonable theory from the evidence which would support the position."'
"Crosslin v. State, 446 So.2d 675, 682 (Ala.Cr.App.1983)(capital offense of murder of two persons in a single transaction); applied in McNeill v. State, 496 So.2d 108, 109 (Ala.Cr.App.1986)(capital offense of murder during a robbery)."
Fletcher v. State, 621 So.2d at 1019-20.
While the degree of intoxication necessary to negate specific intent must rise to the level of insanity, it is clear that where there is evidence of intoxication, the extent to which the accused is intoxicated is a question to be decided by the jury. Crosslin v. State, 446 So.2d at 682.
"In order to determine whether the evidence is sufficient to necessitate an instruction and allow the jury to consider the defense, `we must accept the testimony most favorable to the defendant.'... United States v. Lewis, 592 F.2d 1282, 1286 (5th Cir.1979). The Alabama Supreme Court has indicated that proper written requested instructions must be given `which are supported by any evidence, however weak, insufficient, or doubtful in credibility.' Chavers v. State, 361 So.2d 1106, 1107 (Ala.1978)."
Coon v. State, 494 So.2d 184, 186 (Ala.Cr. App.1986).
The State argues that, while there was evidence presented that Hammond had used crack cocaine continuously the night of the killing until the time McNeil was killed, there was no evidence that the cocaine caused Hammond to be intoxicated. The prosecutor asked Sandra Jackson:
"Q: Now, tell us about the crack cocaine that you smoked. How long did it affect you, in any manner or fashion? Did it give you a high, or could you tell that you were under the influence? I mean, was it two or three hours it affected you?
"A: No. Anywhere from 10 to 15, 20 minutes."
(R. 755.) The prosecutor also asked Sandra Jackson if there were any times that Hammond could not drive his automobile or was unable to understand what she was saying to him. Jackson responded, "No." (R. 757-58.)
*888 The facts of this case are similar to those of Owen v. State, 611 So.2d 1126 (Ala.Cr.App.1992), where evidence was introduced indicating that the appellant had drunk anywhere from four to eight beers within a two-hour period before the murder, but two police officers testified that he did not appear to them to be intoxicated.[2] This Court held that evidence of the drinking of as many as eight beers within that period supported an instruction on intoxication. Quoting from Silvey v. State, 485 So.2d 790, 792-93 (Ala.Cr.App.1986), this Court held:
"`"There being some testimony tending to show that defendant was drunk, he had a right to have the jury pass upon its credibility and sufficiency to prove that he was so drunk as to be incapable of forming the specific intent...."'"
Owen v. State, 611 So.2d at 1128-29. This holding is consistent with the holding in Fletcher v. State, supra, in which we adopted the rationale of People v. Rodriguez, 76 N.Y.2d 918, 563 N.Y.S.2d 48, 49, 564 N.E.2d 658, 659 (Ct.App.1990):
"`[An intoxication] charge may ... be warranted if the record contains evidence of the recent use of intoxicants of such nature or quantity to support the inference that their ingestion was sufficient to affect defendant's ability to form the necessary criminal intent.'"
Fletcher v. State, 621 So.2d at 1020-21 (emphasis omitted).
We reach a similar holding in this case. There was clear, undisputed evidence that Hammond had smoked from six to eight pieces of crack cocaine in the three to four hours before the death of James McNeil. In fact, the prosecution argued that it was Hammond's need for more crack cocaine that was the motive for his killing and robbing McNeil.
While the degree of intoxication necessary to reduce a charge from murder to manslaughter when the intoxication is voluntary must be so great as to "amount to insanity," Ex parte Bankhead, 585 So.2d 112, 121 (Ala.1991), whether that degree of intoxication was sufficiently proved in this case was a factual question which should have been left for the jury's determination. Owen v. State, 611 So.2d at 1128. Because there was no instruction on intoxication, the jury was not given the opportunity to resolve this factual question.
The trial court declined to give an intoxication instruction or any instructions on lesser included offenses because it determined that the defense theory was a denial that Hammond had committed the offense.
"THE COURT: Well, as I see the case and how it's unfolded, basically, the defense has been, `I wasn't there. Somebody else did it.' If he was there, and that was the defense, he was there and that he did it under the influence of narcotics or whether or not it was a heat of passion type thing or whatever, fine. But the defense has been, `he hasn't even been there.' ... So, you know, there's been no evidence before the court that can be anything except for capital murder. That's a murder committed during a robbery."
(R. 1778-79.) However, it did not matter that Hammond denied committing the act; because evidence of intoxication was introduced by the State, he was still entitled to a jury charge on the effect of intoxication on the intent element of a specific intent crime. Coon v. State, 494 So.2d 184, 187 (Ala.Cr.App.1986). The trial court's failure to instruct the jury on the effect of intoxication was reversible error.
Because we have determined that the failure to instruct the jury on intoxication was reversible error, we need not address the question whether the failure to give an accompanying manslaughter instruction was also reversible error.

*889 "We do observe, however, that `[i]t is much the safer rule to charge upon all the degrees of homicide included in the indictment, when a party is on trial for murder, unless it is perfectly clear to the judicial mind that there is no evidence tending to bring the offense within some particular degree.' Phelps v. State, 435 So.2d 158, 163 (Ala.Cr.App.1983), quoted in Jones v. State, 514 So.2d 1060, 1064 (Ala.Cr.App.), cert. denied, 514 So.2d 1068 (Ala.1987). This is especially true `[i]n a capital case, [where] there is the intolerable and constitutionally prohibited risk of an unwarranted conviction that is created when the jury is deprived of the "third option" of convicting the defendant of a lesser included offense.' Connolly v. State, 500 So.2d 57, 67 (Ala. Cr.App.1985), affirmed, 500 So.2d 68 (Ala.1986)."
Fletcher v. State, 621 So.2d at 1022.
We are compelled, therefore, to reverse the appellant's conviction and to remand this cause to the circuit court for proceedings consistent with this opinion. Because we must reverse on this issue, we will not discuss most of the other issues raised by Hammond. However, because one issue may arise on any retrial of this case, we feel compelled to address it now.

II.
Hammond argues that during the sentencing phase of trial the prosecutor committed reversible error when he informed the jury that Hammond had previously been sentenced to death for the same offense at a previous trial. We agree.
It is clear from the record that, by the time the jury began its deliberation in the sentencing phase, the prosecutor had informed the jury that there had been a previous trial in September of 1990, and that, after that trial, Hammond had spent six years on death row. While the information concerning Hammond's stay on death row was elicited under the guise of cross-examination that tested the knowledge of the three defense character witnesses, the prosecutor overstepped the bounds of proper cross-examination when he used this questioning to inform the jury Hammond had been on death row.
The record indicates that, at the start of the trial, the trial court granted the defense's motion in limine prohibiting the prosecution from "mentioning the fact that this case has previously been tried, and a guilty verdict for capital murder was rendered, and he was sentenced to the death penalty." (R. 15-16.) However, during the guilt phase of trial, both the prosecutor and the defense counsel used the transcript of the previous trial to impeach, to rehabilitate, and to refresh the recollection of the witnesses with their prior testimony. All of this was done without objection. However, many of the predicate questions of Mr. Valeska, the prosecutor, clearly informed the jury there had been a previous trial:
"Q [Prosecutor]: Let's go to page 605, where you gave sworn testimony on September 11, 1990, in this very courtroom in front of Jerry Hammond sitting right over there; Michael Crespi up there [indicating the bench], do you remember that?
"A: Yes.
"Q: Remember a court reporter?
"A: Yes.
"Q: Remember him having two lawyers?
"A: Yes."
(R. 866.)
"Q: [Prosecutor]: Let me just ask, do you recall testifying under oath as I asked you back in September of 1990, and in answering my questions in this very courtroom with Michael Crespi on the bench, and Mr. Hammond being present, and defense lawyers who represented him, asking you this question? Do you recall? Remember being here and testifying?

*890 "A: Yes, sir."
(R. 1520-21.)
Although this line of questioning did not directly violate the trial court's order not to inform the jury of the "previous trial, guilty verdict, and death sentence," it served as a foundation for the prosecutor's questioning during the sentencing phase of trial. Hammond's first sentencing witness was his pastor. The trial counsel asked the pastor, "I understand Mr. Hammond has been incarcerated for about eight years. So would you please tell the ladies and gentlemen of the jury, during the time prior to the time he was incarcerated, would you tell the ladies and gentlemen of the jury what kind of man you saw coming into your church?" (R. 2123.) The pastor responded by speaking about Hammond's good works while attending the church and giving his opinion about Hammond's character. On cross-examination, Mr. Valeska asked the following questions, without objection:
"Q: Okay. Now, Rev. Gowens, you wrote a letter to another Circuit Judge, Michael Crespi, in the past, in reference to whether Jerry Hammond should receive the death penalty or life without parole before, correct? I'm not trying to trick you.
"A: I don't remember the
"Q: Let me show you, if this refreshes your recollection. Once again, looking at that letter.
"A: Yes, that's my letter.
"Q: And you wrote a letter to Judge Crespi, correct?
"A: That's right.
"Q: And you said that you had been the pastor of Jerry Hammond and his family, correct?
"A: Right.
"Q: And you indicated you were concerned about Mr. Hammond in relationship as to what would happen at his sentencing?
"A: Right.
"Q: And you told the Honorable Michael Crespi, whatever the outcome, I will continue to work with his family, his children, correct?
"A: Right.
"Q: And you asked him to find mercy in sentencing him along with his family and they would be thankful, correct?
"A: Yes, sir.
"Q: Now, Rev. Gowens, my question to you is, Mr. Decker said that he had been in the Houston County Jail for eight years. You have not visited him in the past eight years in the Houston County Jail, have you?
"A: Mr. Hammond?
"Q: Yes, sir.
"A: Oh, yes.
"Q: You are telling this Jury under oath from right now, 1996, going back eight years: 1995, 1994, 1993, 1992, 1991, 1990, 1989, 1988, from August 3 or 4, excuse me, August 5, 1988 until today, for the past eight years, you have visited and seen Jerry Hammond in those past eight years in the Houston County Jail, you are not saying that, are you?
"A: Of course not, because he hasn't been over there.
"Q: Where's he been?
"A: I don't know. I think, he was in Atmore.
"Q: On death row, correct?
"A: I suppose so ...
"Q: You testified under oath, previously, in the case [of] State of Alabama v. Jerry Hammond, correct?
"A: Right.
"Q: You testified for the defense. You testified in this very courtroom, do you recall?
"A: That's right."
(R. 2129-31.)
When Hammond's sister testified that her brother was good to his parents and to his family and that he was a church-going person, Mr. Valeska returned to his previous *891 pattern of questioning on cross-examination:
"Q: Is it fair to say your brother was charged with capital murder in 1988?
"A: He was charged with it.
"Q: Now, can you tell the ladies and gentlemen of the Jury, you mentioned that your parents are elderly, is that correct? Let's go back to September of 1990, about September 11, 12, 13, 14, up until today; your brother has not been in Dothan, has he?
"A: He's in Dothan now.
"Q: What I want to ask you is, he never came to visit your parents at the house, did he?
"A: Not since he's been locked up, no.
"Q: He's been locked up from 1990 to 1996, correct?
"A: That's right."
(R. 2149.)
Then, after the Houston County jailer testified that Hammond had never been subject to any disciplinary action while a prisoner at that jail, Mr. Valeska, this time over the objections of trial counsel, again elicited information about Hammond's whereabouts from 1990 to 1996:
"Q: Does the paperwork in front of you contained in the records of the Defendant that you were the keeper of the records, the originals, does it indicate on February 22, 1990, that a Circuit Judge ordered Jerry Hammond to be taken out of the Houston County Jail and transported to Atmore? Yes or no.
"A: Well, this paper
"Q: Does not the Order say, "Immediately"? Signed by Michael Crespi on February 22, 1990?
"A: It does say underto be made available on February 22, 1990."
(R. 2173-74.)
When trial counsel objected to Mr. Valeska's attempt to elicit from the Houston County jailer where Hammond had been incarcerated since 1990, the trial court overruled the objection and allowed Mr. Valeska to continue his questioning, noting that the information had already come in, without objection, during the cross-examination of Reverend Gowens. (R. 2171-72.)
The State argues that Mr. Valeska's line of questioning did not amount to plain error because it occurred during, the sentencing phase, where the rules of evidence were relaxed, and where Hammond was "no longer cloaked with the presumption of innocence." The State argues that Mr. Valeska was properly impeaching Reverend Gowen's knowledge of Hammond's character when he asked him about Hammond's stay on death row. However, a review of Reverend Gowen's testimony shows that neither he nor defense counsel ever intimated that Hammond had been incarcerated in Houston County, nor did he imply that his knowledge of Hammond was based on a relationship subsequent to 1990. Mr. Valeska's cross-examination of Reverend Gowens did not attempt to impeach him with a prior inconsistent statement, or bring into focus the sparsity of the witness's knowledge of Hammond. Instead, the focus of the cross-examination was to inform the jury that Reverend Gowens had made the identical plea for mercy to another jury and another judge six years previously, and the result of that plea was the imposition of the death penalty.
Likewise, the focus of Mr. Valeska's cross-examination of Hammond's sister and the jailer was not to probe their knowledge of Hammond, but to highlight the fact that Judge Michael Crespi had sent Hammond to Atmore as a result of the September 1990 trial. Had impeachment of these witnesses been the focus of the prosecutor's questions, the fact that none of the witnesses had maintained a relationship with Hammond since 1990 would have been paramount, not the fact that Hammond had been on death row in Atmore.
"The primary duties of the office of the District Attorney are to see that *892 justice is done, Adams v. State, 280 Ala. 678, 198 So.2d 255 (1967), and to see that the state's case [is] properly presented to the court and jury as made by the evidence. Wilbanks v. State, 28 Ala. App. 456, 458, 185 So. 770 (1939); Williams v. State, 34 Ala.App. 253, 39 So.2d 29 (1949).
"`The office of solicitor is of the highest importance; he is the representative of the state, and as a result of the important functions devolving upon him as such officer necessarily holds and wields great power and influence, and as a consequence erroneous insistences and prejudical conduct upon his part tend to unduly prejudice and bias the jury against the defendant; this, without reference to the instructions of the court. The test in matters of this kind is not necessarily that the conduct of the solicitor complained of did have such effect upon the jury, but might it have done so?'
"Taylor v. State, 22 Ala.App. 428, 429, 116 So. 415, 416 (1928); Jones v. State, 23 Ala.App. 493, 495, 127 So. 681 (1930); Bynum v. State, 35 Ala.App. 297, 298, 47 So.2d 245, cert. denied, 254 Ala. 22, 47 So.2d 247 (1950).
"In the performance of his duties the District Attorney should treat the defendant fairly and the witnesses courteously, both in examination and in argument. Campbell v. State, 19 Ala.App. 349, 352, 97 So. 783 (1923). The prosecuting attorney has a duty to be fair and impartial in presenting the evidence and in examining or cross-examining witnesses. Melton v. State, 21 Ala.App. 419, 109 So. 114 (1926). While he may not take unfair advantage of a defendant, he is under a duty to prosecute with earnestness and vigor. Arant v. State, 232 Ala. 275, 167 So. 540 (1936)."
Sprinkle v. State, 368 So.2d 554, 560 (Ala. Cr.App.1978).
We hold that at the sentencing phase of a second or subsequent capital murder trial, it is reversible error for the prosecution to comment on the result of a defendant's previous trial for the same offense. Frazier v. State, 632 So.2d 1002, 1007 (Ala.Cr.App.1993). It does not matter that trial counsel did not preserve this error for review; we find the error to be plain error. Rule 45A, A.R.App.P; Tomlin v. State, 591 So.2d 550 (Ala.Cr.App. 1991); Frazier v. State, supra. This is especially so when the prosecution informs the jury that a previous jury recommended, and a previous judge imposed, the death penalty. In determining whether Hammond should receive the death penalty or life imprisonment without parole, this jury was aware of how another jury had resolved this very issueadversely to the defendant. If a juror was uncertain as to whether aggravating circumstances existed, or, if found to exist, whether they outweighed the mitigating circumstances, the knowledge that 12 other people had determined that it did could have swayed the juror's verdict in favor of death. Further, the jury's awareness of Hammond's previous death sentence would diminish its sense of responsibility and mitigate the serious consequences of its decision. People v. Hope, 116 Ill.2d 265, 274, 508 N.E.2d 202, 205, 108 Ill.Dec. 41, 45 (Ill.1986).
Because this was a death penalty case, it is not unreasonable to assume that the jury would have difficulty in arriving at an appropriate sentence, and we cannot be certain that the knowledge of the previous death sentence was not placed in the scales in the formation of this jury's ultimate judgment. Stain v. State, 273 Ala. 262, 267, 138 So.2d 703, 707 (Ala.1961). Thus, even if we had not reversed the judgment and remanded this cause on other grounds, we would have remanded this cause for a new sentencing hearing.
The judgment in this case is reversed, and the cause is remanded to the trial *893 court for proceedings consistent with this opinion.
REVERSED AND REMANDED.
LONG, P.J., and McMILLAN, J., concur.
BASCHAB, J., dissents in part with opinion in which BROWN, J., joins.
BASCHAB, Judge, dissenting in part.
I must respectfully disagree with Part I of the majority opinion. The trial court did not err in refusing to instruct the jury on intoxication because there was no evidence that the appellant was, in fact, intoxicated at the time of the murder. In § 13A-3-2(e)(1), Ala.Code 1975, the legislature defined "intoxicated" to include "a disturbance of mental or physical capacities resulting from the introduction of any substance into the body." This definition requires a two-pronged showing: 1) that a substance was introduced into the body and 2) that, as a result, the defendant's mental or physical capacities were disturbed. It is this second prong that has not been shown in this case. Simple consumption or ingestion of a substance alone is not sufficient evidence to show that a person is intoxicated. There must be some evidence of an impairment of the person's mental or physical capacities as a result of the introduction of the substance into the body. Furthermore, there must be some evidence that that mental or physical impairment existed at the time the offense was committed. This definition of "intoxication" is illustrated by our holding in Windsor v. State, 683 So.2d 1027 (Ala. Cr.App.1994), aff'd, 683 So.2d 1042 (Ala. 1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997). In Windsor, we held:
"In this case, however, there was no evidence that the appellant was intoxicated. Although there was evidence that the appellant had been drinking beer on the day of the robbery-murder, there was no evidence concerning the quantity of beer he consumed that day at the time of the murder. Evidence that someone was drinking an alcoholic beverage is not evidence that that person was intoxicated. There was no `reasonable theory' to support an instruction on intoxication because there was no evidence of intoxication. The court did not err in not instructing the jury on intoxication and manslaughter where there was no evidence that the appellant was intoxicated at the time the robbery-murder occurred."
683 So.2d at 1037.
Sandra Jackson testified that she and the appellant used crack cocaine four times on the evening of the murder. Jackson, who had used crack cocaine before the night of the murder, testified that the effects of cocaine usually last 10 to 20 minutes. She further testified that she and the appellant stayed at the appellant's house at least 15 to 25 minutes after the last time they used cocaine, and that they then drove to the victim's house, which took approximately 10 minutes. There was no indication that the appellant's mental or physical capacities were disturbed at the time of the murder. There was no evidence that the appellant was under the influence of, much less intoxicated from, the crack cocaine he allegedly used before the murder. In fact, his actions belie his contention.
Jackson was the only person with the appellant immediately before and immediately after the murder. Her testimony indicated that the appellant was aware of the seriousness of and the possible consequences of his actions. She testified that he was never so impaired that he could not drive his vehicle. In fact, he was able to drive his car and to communicate with and understand Jackson the entire evening. He expressed his intent to obtain money to buy more drugs. As he got out of the vehicle, he was carrying a knife and a towel, and he specifically told Jackson he was not going to the victim's house. He told her he would get the money from a woman he knew. When he returned to the *894 car and she asked what he had done, he replied, "Nothing." As she continued to ask him what he had done, he told her to shut up. When she asked him to let her get out of the car, he told her he would not let her out and told her to shut up before he killed her. At the same time, he was discarding evidence that would connect him to the crime. He threw his shirt, a pair of pants he had apparently obtained from the victim's house, the victim's wallet, and the knife out of the car at various points along the route home. However, he and Jackson later returned to the places where they had discarded those items to search them for more money. Shortly after the murder, when police drove by a house where he was standing outside, he acted nervous and asked to go inside. Jackson did not, at any point, testify that the appellant's physical or mental capacities appeared to be impaired or disturbed in any fashion at the time of the murder. In fact, no one testified to that effect. Thus, there was no evidence that the appellant's mental or physical capacities were disturbed at the time of the murder. Rather, there is simply testimony that he may have used some crack cocaine at least 25 to 40 minutes before the murder and that the effects of the cocaine lasted only 10 to 20 minutes.
The appellant did not establish that he was intoxicated at the time of the murder. Rather, his "conduct and demeanor immediately after the crime provided a reasonable inference of sanity." Cunningham v. State, 426 So.2d 484, 491 (Ala.Cr.App. 1982). See also Smith v. State, 646 So.2d 704 (Ala.Cr.App.1994). The evidence showed that he was able to operate a vehicle and to communicate with other people both before and after the murder. He specifically stated, as he left the vehicle, that he was not going to the victim's house. His conduct after he returned to the vehicle indicates that he was acutely aware of the criminality of his conduct. In response to questions about what he had done, he told Jackson to "shut up" and, at one point, threatened to kill her. He also purposely discarded evidence that would have connected him to the crime. Nevertheless, when he wanted more money after the crime, he was able to remember where he had discarded the items and to return to those places to search the items for more money. Finally, he acted nervous when police officers drove past a home where he was visiting. Considering the appellant's actions and statements immediately before and after the murder, there is no indication that his mental or physical capacities were impaired at the time of the murder. In fact, there was no evidence of intoxication at the time of the murder.
"`A trial court has broad discretion in formulating its jury instructions.' Coon v. State, 494 So.2d 184, 186 (Ala.Cr.App. 1986). Charges which are `inapplicable or abstract' are correctly denied. See McDaniel v. State, 446 So.2d 670, 674 (Ala.Cr.App.1983)."
Gordon v. State, 587 So.2d 427, 432-33 (Ala.Cr.App.1990), rev'd on other grounds, 587 So.2d 434 (Ala.1991). A judge must formulate instructions based on the evidence presented. Although there was evidence that the appellant had used cocaine the night of the murder, there was no showing that, at the time of the murder, his mental or physical capacities were impaired as a result of his earlier use of the crack cocaine. Rather, the evidence shows that the appellant was acutely aware of what he had done. Evidence that the appellant may have used drugs on the evening of the murder is not evidence that he was intoxicated at the time of the murder. There was no reasonable theory that would have supported an instruction on intoxication. Ex parte Windsor, 683 So.2d 1042 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997). Therefore, the trial court properly refused to charge the jury on intoxication.
The majority's reliance on Fletcher is misplaced. The majority apparently bases *895 its decision on the following portion of Fletcher:
"We recognize that `[t]he degree of intoxication necessary to negate specific intent ... must amount to insanity.' Ex parte Bankhead, 585 So.2d 112, 121 (Ala. 1991). However, it is clear that where there is evidence of intoxication, the extent to which the accused is intoxicated is a question to be decided by the jury. Crosslin v. State, 446 So.2d 675, 682 (Ala.Cr.App.1983). See Ex parte Bankhead, 585 So.2d at 121; Chatham v. State, 92 Ala. at 49, 9 So. at 608; Owen v. State, 611 So.2d at 1128; Anderson v. State, 507 So.2d 580, 584 (Ala.Cr.App. 1987). In determining that the appellant `was [not] so intoxicated that he didn't know what he was doing,' the trial court in the instant case `invaded the exclusive province of the jury.' Owen v. State, 611 So.2d at 1128."
621 So.2d at 1021. The majority's interpretation of Fletcher would require a trial court to instruct on intoxication in every case in which there is any evidence that a person ingested drugs or alcohol before committing an offense. Such a reading, however, is simply untenable and unwarranted. Fletcher does not stand for the proposition that ingestion of a substance alone constitutes intoxication. Rather, it stands for the proposition that a charge on intoxication must be given "where there is evidence of intoxication." 621 So.2d at 1021 (emphasis added). For there to be evidence of intoxication, there must be a showing of ingestion of a substance coupled with a disturbance of the defendant's mental or physical capacities as a result of that ingestion. § 13A-3-2(e)(1), Ala.Code 1975. The majority appears to define intoxication as mere ingestion of a substance, with no requirement that there be some disturbance of the defendant's mental or physical capacities. Neither Fletcher nor § 13A-3-2(e)(1), Ala.Code 1975, defines intoxication as mere ingestion of a substance. Because there was no showing of both prongs of the definition of intoxication, the trial court properly denied the request for an instruction on intoxication.
NOTES
[1] Hammond was convicted of capital murder and was sentenced to death in September 1990. This court reversed the conviction and remanded the case for retrial because the record was incomplete. Hammond v. State, 665 So.2d 970 (Ala.Cr.App.1995). It appears from the record that Hammond was originally indicted for capital murder in October 1988. After the State attempted to amend the indictment, Hammond entered into a plea agreement pursuant to which he agreed to plead to "solicitation to commit unlawful distribution of a controlled substance," to accept a sentence of 18 years' imprisonment, and to pay a fine of $5,000. As part of the plea agreement, Hammond agreed to deny in open court any involvement in the crime, and further agreed that if he was called as a witness in the capital murder trial of the State's main witness in this present case, Sandra Jackson, he would not testify that he alone killed and/or robbed the victim. The State agreed that, once Hammond fulfilled his part of the agreement, the State would move that the capital charge against Hammond be dismissed "with prejudice" and would not pursue "any further prosecution on the basis of those facts." On February 16, 1989, the trial court accepted the plea agreement and sentenced Hammond in accordance with the agreement. Sandra Jackson's subsequent capital murder trial resulted in a mistrial when the jury was unable to reach a verdict. On August 4, 1989, Hammond petitioned the trial court for a writ of habeas corpus seeking to vacate his conviction and his 18-year sentence, contending that the trial court lacked jurisdiction to accept his guilty plea and to sentence him because, he argued, the crime to which he had pleaded guilty was not a lesser included offense of the capital crime of murder-robbery. On February 20, 1990, the trial court agreed and set aside the conviction and restored the capital charge to the docket. Hammond v. State, 665 So.2d at 973.
[2] The officers' testimony is discussed in an earlier opinion involving the same murder. See Owen v. State, 586 So.2d 958 (Ala.Cr.App. 1991).